Public Employee Labor Relations Board
No. 89-529

### APPEAL OF THE SANBORN REGIONAL SCHOOL BOARD
(New Hampshire Public Employee Labor Relations Board)

August 14, 1990

514

*Bradley Kidder Law Firm,* of Laconia (*Bradley F. Kidder* on the brief and orally), for the petitioner, Sanborn Regional School Board.

*James F. Allmendinger,* of Concord, staff attorney, NEA-New Hampshire, by brief and orally, for the respondent, Sanborn Regional Educational Association.

*Michael C. Reynolds,* of Concord, general counsel, by brief for the State Employees' Association of New Hampshire, Inc., as *amicus curiae.*

*Cook & Molan P.A.,* of Concord (*Glenn R. Milner* on the brief), by brief for Professional Firefighters of New Hampshire, as *amicus curiae.*

*H. Bernard Waugh, Jr.,* of Concord, by brief for New Hampshire Municipal Association, as *amicus curiae.*

*Krasner Professional Association,* of Farmington (*Emmanuel Krasner* on the brief), by brief for New Hampshire Federation of Teachers, as *amicus curiae.*

*Hatfield, Moran & Barry P.A.,* of Hillsborough (*Jane A. Cummings* and *Douglas S. Hatfield, Jr.,* on the brief), by brief for New Hampshire School Administrators Association and New Hampshire School Boards Association, as *amici curiae.*

*Kathleen Wrobel & a,* by brief for a group of Newton taxpayers, as *amici curiae, pro se.*

PER CURIAM. This appeal arises from a decision of the New Hampshire Public Employee Labor Relations Board (PELRB) in response to the Sanborn Regional School Board's (school board) allegations that the Sanborn Regional Educational Association (association) committed an unfair labor practice in declining to renegotiate the second and third years of a collective bargaining agreement. The controversy arose over the results of the annual Sanborn school district meeting held on March 9, 1989, where the voters failed to approve and fund an increase in the teachers' salaries as required by the second-year terms of the collective bargaining agreement. The PELRB found that the association had not committed an unfair labor practice and dismissed the school board's complaint. For the reasons following, we reverse and remand.

The school board and the association entered into a collective bargaining agreement which covered the period July 1, 1988, through June 30, 1991. In February 1988, the school board members and union representatives initialed the collective bargaining agreement. At the annual school district meeting held in March 1988, the voters approved the appropriation for the funding of the salaries for the first year of the collective bargaining agreement. The formal signing of the agreement did not take place until May 18, approximately eleven weeks after the school district meeting. This agreement contained, *inter alia*, provisions with regard to teachers' salaries, extracurricular activities, and support staff compensation. The record reveals that certain concessions were made by the association in the first year of the agreement which were intended to be offset by the terms of the second and third years. It appears that the association, at the conclusion of the negotiations, was satisfied with the agreement as a whole and would not necessarily have considered the terms of each individual year acceptable, when isolated from the remaining portions of the agreement.

On March 9, 1989, the school district conducted its annual meeting for that year. Contained within the 1989 school district warrant was article 3, which provided as follows:

"To see if the District will vote to raise and appropriate the sum of Four Hundred Twenty-Five Thousand Eight Hundred Seventy Dollars ($425,870.00) for the fiscal year 1989–90, such sums of money representing the additional costs attributable to the increase in teachers' salaries and benefits over those paid in the 1988–89 fiscal year."

In addition, the warrant also contained two other separate articles requesting approval of certain salary increases for school administrators over those paid in 1988–89 and also to fund the second year of a negotiated settlement with the Sanborn Regional Support Staff (support staff). All three articles dealt with appropriations for the 1989–90 school year and were silent with regard to the requirements of either the collective bargaining agreement or the aforementioned negotiated settlement in subsequent years.

At the 1989 school district meeting, the voters approved the funding of the second year of the negotiated settlement with the support staff only, and declined to approve the salary increases for the teachers or the school administrators as required by the terms of the collective bargaining agreement. Instead, the voters approved the appropriation of $212,935 for increases in teachers' salaries, approximately one-half the amount negotiated in the collective bargaining

agreement. In addition, the voters cut the school administrators' salary increases by one-half and incidentally cut $196,067 from the school district's operating budget. These cuts totaled approximately $425,000.

On March 27, 1989, the school board sent notification to the association that, because the school district voters had failed to approve the negotiated salary increases, "[t]he Sanborn Regional School Board wishe[d] to exercise its rights under RSA 273-A:3, II, to re-open negotiations on the salaries for the 1989–90 school year." The association responded by letter, dated March 31, 1989, notifying the school board that the association had voted not to reopen negotiations and that in its opinion the school district was bound to finance the second and third-year terms of the collective bargaining agreement. Based upon the association's unwillingness to renegotiate the terms of the collective bargaining agreement, the school board, on April 10, 1989, filed an unfair labor practice charge against the association. The question which is presented to us is easily stated, but more difficult to resolve: Under what circumstances is a school district bound by a collective bargaining agreement negotiated in good faith between a teacher's union and a district school board, when the agreement is a multi-year contract providing for specific teacher salary increases during the life of the contract?

On June 15, 1989, a hearing was held before the PELRB with regard to the school board's allegations that the association had committed an unfair labor practice in refusing to renegotiate the terms of the collective bargaining agreement. By order dated October 24, 1989, the PELRB dismissed the school board's complaint, finding that: (1) a multi-year contract was negotiated by both parties, (2) the voters funded, without question or modification, the first year of the collective bargaining agreement, (3) when funding the first year of the agreement, the voters were made aware of the implications of the 3-year salary schedule, (4) the policy behind the enactment of RSA chapter 273-A was to foster harmonious and cooperative relations between public employers and their employees, and (5) based upon its findings, the school board and the public employer have the responsibility to fund the negotiated salary increases and that the association had not committed an unfair labor practice.

On appeal, the school board claims that RSA chapter 273-A does not contemplate multi-year agreements because it requires "cost items" to be submitted to the legislative body (school district voters) for approval, modification, or rejection each year. In addition, the school board contends that, apart from any claim that the voters of the district lacked authority to bind the district to the second and

third year terms of the collective bargaining agreement, there was insufficient evidence in the record to support the PELRB's finding that the voters had sufficient knowledge of the terms of the collective bargaining agreement to bind the district by the first-year appropriation.

■■■■ Collective bargaining agreements are construed in the same manner as other contracts, subject to the law controlling at the time of their execution. *Mastro Plastics Corp. v. Labor Board*, 350 U.S. 270, 279 (1955). In order for a contract to be formed there must be a meeting of the minds as to the terms thereof. *Turcotte v. Griffin*, 120 N.H. 292, 294–95, 415 A.2d 668, 669 (1980). For such a meeting of the minds to take place, each party must have the same understanding as to the terms of the agreement. *Id.* In addition, before a contract can be formed each party must manifest an intention to be bound, 17 AM. JUR. 2d *Contracts* § 1, at 333 (1964), supported by adequate consideration, *Lang v. Johnson*, 24 N.H. 302, 307 (1851). Every contract so formed "contains an implied covenant of good faith and fair dealing." *Albee v. Wolfeboro Railroad Co.*, 126 N.H. 176, 179, 489 A.2d 148, 151 (1985).

Section 2.1 of the collective bargaining agreement provides that negotiations between the association and the school board are to be conducted in accordance with the procedural requirements of RSA chapter 273-A. Under the provisions of RSA 273-A:3, II(b), the school board is required to submit only "cost items" to the school district voters for their approval. Should the voters reject any part of the submission, or otherwise take action that in any way modifies the terms of the cost item before them, either party may reopen the negotiations. RSA 273-A:3, II(b). "Cost items" are defined as "any benefit[s] acquired through collective bargaining whose implementation requires an appropriation by the legislative body of the public employer with whom negotiations are being conducted." RSA 273-A:1, IV.

The provision of RSA chapter 273-A that requires "cost items" to be submitted to the legislative body does not expressly state that such a submittal must be done annually. RSA 273-A:3, II(b) merely provides that "[o]nly cost items shall be submitted to the legislative body of the public employer for approval." A plain reading of this language would not preclude the school board from submitting the cost items for the full three-year term of the collective bargaining agreement at one school district meeting. Thus, the school board's assertion that this provision requires annual submission appears to be lacking in support.

■ Furthermore, there is no language contained within the remaining sections of RSA chapter 273-A that supports the school board's argument that the legislature did not contemplate collective bargaining agreements greater than one year in duration. On the contrary, RSA 273-A:11, pertaining to the rights of a certified representative of the teacher's association, states that an election to determine who shall represent the association may take place not "less than 120 days prior to the budget submission date *in the year* such collective bargaining agreement shall expire." RSA 273-A:11, I(b) (emphasis added). Clearly this language contemplates that collective bargaining agreements may be greater than one year in duration. To hold otherwise would fly in the face of the stated purposes of RSA chapter 273-A. One is hard pressed to believe that the legislature, in adopting RSA chapter 273-A, contemplated a situation wherein the school teachers union could be called upon to bargain in good faith for a multi-year contract, perhaps, as in this case, giving concessions in the first year in exchange for more liberal treatment in later years, only to have the intent of the contracting parties frustrated by a failure of the district to meet its obligations in subsequent years.

Notwithstanding, the school board argues that the taxpayers at one school district meeting have no authority to override the rights of the voters attending subsequent school district meetings to raise and appropriate funds needed for education. We disagree. *In Blood v. Electric Co.*, 68 N.H. 340, 39 A. 335 (1895), holding that municipalities have the authority to enter into multi-year agreements and bind future voters to the terms of such agreements, we recognized that

> "[i]f a town could disregard its contracts at will on the ground that it has no power to bind itself beyond the moment employed in making them, people would be reluctant to enter into contracts with it. A person would not ordinarily risk his labor and money in ventures so precarious,—certainly not unless the compensation corresponded to the risk. . . . Moreover, a service depending upon such a contract would be unreliable and subject to constant interruptions, and would not meet the public needs."

*Id.* at 342, 39 A. at 336. This holding has been extended to cases dealing with multi-year collective bargaining agreements. *See Rochester Educ. Ass'n v. City of Rochester*, 116 N.H. 402, 405, 359 A.2d 640, 642 (1976). Accordingly, we hold that neither the provisions of RSA chapter 273-A, nor the common law, preclude the school

board from negotiating and entering into multi-year collective bargaining agreements.

In finding that the school board has the authority to enter into multi-year collective bargaining agreements, we note that the provisions of RSA chapter 273-A limit the board's authority to require the legislative body of the school district to make certain appropriations. *See* RSA 273-A:3, II(b). Under the procedural requirements of RSA chapter 273-A, the school board acts as an agent for the school district. This agency is qualified by the language of RSA 273-A:3, II(b) that requires the school board to submit "cost items" to the local legislative body (school district voters) for approval. This provision in essence divests the school board of its authority to bind the town to future appropriations without action by the school district voters. Thus, integral to this decision is the determination as to whether or not the school district voters in fact ratified and adopted the acts of the school board as they pertain to the cost items negotiated in the collective bargaining agreement.

Ratification by a municipal corporation can be express or implied. While implied ratification arises out of the principal's conduct, *see Storrs v. Manchester*, 88 N.H. 139, 144, 184 A. 862, 865 (1936), express ratification can only occur where the municipality embraces the acts of its agent in a manner provided by law. 63 C.J.S. *Municipal Corporations* § 1009(b)(1) (1950). We hasten to point out, however, that implied ratification cannot be based solely on mere inaction, nor may it be based entirely on a municipality's failure to timely disaffirm. *Id.* Upon a finding that ratification has occurred, it applies to the whole contract and not just a part, since the principal should not be allowed to "take the rose without the thorn." 3 AM. JUR. 2d *Agency* § 204 (1986). However, whether express or implied, ratification by the principal, in this case the school district voters, requires full knowledge of the financial terms of the collective bargaining agreement. *See* 63 C.J.S. *Municipal Corporations* § 1009(b)(2) (1950); *see also Storrs v. Manchester*, 88 N.H. at 145, 184 A. at 865. As was recognized in *DeRochement v. Holden*, 99 N.H. 80, 84, 105 A.2d 43, 46 (1954), even if the voters in fact had sufficient knowledge to ratify the agent's actions, if the evidence presented at trial does not establish such knowledge, it will not be presumed.

The New Hampshire legislature, in enacting RSA chapter 273-A, declared that it is the policy of the State to foster and encourage harmonious and cooperative relations between public employers and their employees. This policy is advanced by the establishment of the PELRB, which "is responsible in the first instance for articulating a

coherent body of collective bargaining law to govern public employment." *School Dist. #42 v. Murray*, 128 N.H. 417, 419, 514 A.2d 1269, 1271 (1986). While the provisions of RSA chapter 273-A have set forth guidelines for productive public employee relations, the declared policy cannot help but be frustrated from time to time by the competing interests involved. In requiring submission of cost items to the voters for approval, the legislature has recognized that the voters' interests may not always be in accord with the desires of the school board. In so doing, the legislature has created one more dynamic that further complicates the collective bargaining process. Nevertheless, this requirement is clear and unequivocal.

The underlying purposes of RSA chapter 273-A are laudable, and giving efficacy to those processes is to be encouraged. Multi-year collective bargaining agreements are beneficial to both sides. A person included in the collective bargaining agreement should be able to rely upon the integrity of the agreement's terms, and the citizens of the district or municipality should know what demand the multi-year agreement places upon public funds. Neither side should be required to buy a "pig in a poke."

■■■ In considering the case at hand, our standard of review is dictated by the provisions of RSA 541:13, under which the PELRB's findings of fact are "deemed to be prima facie lawful and reasonable" and its order is entitled to prevail in the absence of a clear showing of unreasonableness or illegality. *See* RSA 541:13; RSA 273-A:14. Although these statutes place a heavy burden on any appellant, in this instance the appealing school board has shouldered the load of demonstrating that the PELRB had insufficient evidentiary support in making the finding on which its order rests, that the voters had approved the second-year (1989–90) increases by their vote in 1988. All the testimony before the board merely supports a finding that the voters were aware of the provisions of the first year only. The articles of the warrant set forth only the terms of the first year of the agreement. The only evidence of an official record that the second-year increases were presented to any district meeting was the copy of the warrant for the meeting of 1989, together with the district clerk's report of votes approving the raises for the support staff and halving the others.

As against this *prima facie* showing of the voters' partial rejection of the cost items in question, the union offered nothing to indicate either that the 1988 warrant had warned of any second-year raises that might be subject to a vote, or that the voters in 1988 were even told of those proposed raises. The fact that the 1988 warrant and meeting record were silent on the subject of second-year raises

was affirmatively shown when the parties, at the court's behest, enlarged the record by filing copies of that warrant and the clerk's report, neither of which mentioned anything about second or third-year salary increases. Had the articles of the warrant detailed the financial terms of the first, second, and third years of the collective bargaining agreement, even though the voters appropriated only the funds for the first year, such a vote could bind the district to fund all three years of the agreement. *Cf. Boston Teachers Union, Local #66 v. School Committee of Boston,* 386 Mass. 197, 204, 434 N.E.2d 1258, 1263 (1982).

It is axiomatic that the voters attending a school district meeting must be warned or called "by a warrant . . . stating the . . . subject matter of the business to be acted upon." RSA 197:5; cf. RSA 39:2 ("subject matter of all business to be acted upon at the town meeting shall be distinctly stated in the warrant"). In order to submit a cost item for review by a school district meeting, the warrant for that meeting must describe the item with enough clarity to apprise the voters of what will be the subject of the meeting. Submission to a school district meeting, therefore, of a proposal to provide salary increases must be warned by a warrant article sufficient to indicate plainly that action may be taken on such matters at the place and time stated.

By our holding today we do not mean to imply that there is no alternative mechanism by which the district voters may be sufficiently apprised of subject matter upon which favorable action will bind the district to monetary obligations extending over a term of years under a collective bargaining agreement. As a practical matter, however, inclusion in the warrant of language apprising the voters of the financial consequences of their actions would seem to be sufficient. Our review of the warrants for the 1988 and 1989 district meetings reveals that they are devoid of such language. Therefore, we hold that in the absence of any evidence in the record establishing that the voters had knowledge of the financial terms relating to all three years of the collective bargaining agreement, the district is not bound to fund the second and third-year terms of the agreement. It follows that the PELRB erred in dismissing the school board's complaint.

*Reversed and remanded.*

HORTON, J., did not sit; the others concurred.