Public Employee Labor Relations Board
Nos. 93-164
 93-684
 93-685
 94-059

APPEAL OF ALTON SCHOOL DISTRICT

(New Hampshire Public Employee Labor Relations Board)

APPEAL OF ROCHESTER FEDERATION OF TEACHERS

(New Hampshire Public Employee Labor Relations Board)

APPEAL OF CONWAY SCHOOL DISTRICT

(New Hampshire Public Employee Labor Relations Board)

October 24, 1995

*Kidder & Burke*, of Laconia (*Bradley F. Kidder* on the brief and orally), for petitioner Alton School District and respondent Rochester School Board.

*Steven R. Sacks*, of Concord, staff attorney, NEA-New Hampshire, by brief and orally, for respondents Alton Teachers Associa-

tion, Conway Education Association, and Conway Educational Support Personnel Association.

*Krasner Professional Association*, of Farmington (*Emmanuel Krasner* on the brief and orally), for petitioner Rochester Federation of Teachers.

*Jay C. Boynton*, of Andover, by brief and orally, for petitioner Conway School District.

*Craig, Wenners, Craig & Casinghino*, of Manchester (*Vincent A. Wenners, Jr.* on the brief), for respondent American Federation of State, County, & Municipal Employees.

*Hastings Law Office, P.A.*, of Fryeburg, Maine (*Gregory A. Weimer* and *Peter G. Hastings* on the brief), for Town of Conway, as *amicus curiae*.

*Theodore E. Comstock*, of Concord, by brief, for New Hampshire School Boards Association, as *amicus curiae*.

*Robert Christy*, of Manchester, for respondent Conway Administrators Association, filed no brief.

JOHNSON, J. Each of these three appeals presents the issue of a school board's financial obligations following expiration of a collective bargaining agreement (CBA) during negotiations for a successor contract. The primary questions raised involve the doctrine of status quo, the definition of a cost item, and voter approval of cost items. In the two consolidated *Alton* cases, the public employee labor relations board (PELRB) ruled that the school board must pay teachers salary increases for additional levels of experience and education achieved during the status quo period. The PELRB relied in part on the school district voters' appropriation of sufficient funds for these expenses. We reverse the PELRB's ruling regarding the experience increases but affirm with regard to the education increases. In the *Rochester* case, the PELRB ruled that the school board was not required to pay experience increases during the time in question, and we affirm that ruling. In the *Conway* case, the PELRB ruled that the school board must continue to provide bargaining unit members with the health insurance benefits they enjoyed during the life of the CBAs; we affirm there also.

■ We begin with an overview of the current state of the law. A CBA is a contract between a public employer and a union over the terms and conditions of employment. Generally, in cases involving school districts, the local school board acts as an agent for the public employer during negotiations. It lacks, however, the authority to

appropriate public dollars, and therefore, a CBA negotiated by a school board and a union remains unenforceable until the legislative body of the public employer ratifies the CBA's cost items. *See Appeal of Sanborn Regional School Bd.*, 133 N.H. 513, 520, 579 A.2d 282, 285 (1990). A "cost item" is "any benefit acquired through collective bargaining whose implementation requires an appropriation by the legislative body of the public employer with which negotiations are being conducted." RSA 273-A:1, IV (1987).

The parties to a CBA are not bound by its cost items unless the legislative body ratifies them. RSA 273-A:3, II(b) (1987). Ratification of cost items occurs only if the legislative body approves them with "full knowledge" of their terms. *Sanborn*, 133 N.H. at 520, 579 A.2d at 286; *see Appeal of City of Franklin*, 137 N.H. 723, 728–29, 634 A.2d 1000, 1003–05 (1993); *Appeal of Franklin Education Assoc.*, 136 N.H. 332, 334, 616 A.2d 919, 920–21 (1992). The PELRB determines in the first instance whether the requisite knowledge exists as a matter of fact.

■■ A CBA may contain an automatic renewal clause, sometimes referred to as an "evergreen clause." Such a clause purports to continue the terms of the contract indefinitely until the parties negotiate, and the legislative body ratifies, a successor contract. An automatic renewal clause is a cost item, *Appeal of Milton School Dist.*, 137 N.H. 240, 243, 625 A.2d 1056, 1058–59 (1993), and it therefore does not bind the parties unless it has been ratified by the legislative body, *id.* at 244, 625 A.2d at 1059.

■■ In the absence of a binding automatic renewal clause, a CBA ends on its termination date. Once a CBA expires, while the parties continue to negotiate for a successor agreement, their obligations to one another are governed by the doctrine of maintaining the status quo. *See Milton*, 137 N.H. at 245–48, 625 A.2d at 1059–61.

> [T]he principle of maintaining the status quo demands that all terms and conditions of employment remain the same during collective bargaining after a CBA has expired. This does not mean that the expired CBA continues in effect; rather, it means that the conditions under which the teachers worked endure throughout the collective bargaining process.

*Id.* at 247, 625 A.2d at 1061. We have specifically held that the doctrine of status quo does not require payment of salary increases based on additional years of experience ("step increases") after a CBA expires. *Id.* at 246–47, 625 A.2d at 1061. The status quo

doctrine stems from RSA 273-A:5, I(e), II(d) (1987), which makes it an unfair labor practice for either party to refuse to negotiate in good faith the terms and conditions of employment, *see also* RSA 273-A:3, I (1987). A unilateral change in a condition of employment is equivalent to a refusal to negotiate that term and destroys the level playing field necessary for productive and fair labor negotiations. *See generally* Laws 1975, 490:1.

■■ Either party to a CBA may bring an unfair labor practice complaint before the PELRB to resolve a dispute concerning the employment relationship. RSA 273-A:6 (1987 & Supp. 1994). If a party appeals the decision of the PELRB to this court, our review of the agency's ruling is governed by RSA 541:13 (1974). *Appeal of State of N.H.*, 138 N.H. 716, 719–20, 647 A.2d 1302, 1305 (1994). We defer to the PELRB on issues of fact and affirm its decision unless we find it to be unlawful or clearly unreasonable. *Id.*

*I. The Alton Appeals*

The last CBA of the Alton School Board and the Alton Teachers Association was a one-year contract governing the 1991–92 school year. Its duration clause reads: "The provisions of this agreement will be effective September 1, 1991 and will remain in full force and effect until August 31, 1992 and thereafter renew itself automatically for successive terms of one year or until a successor agreement has been ratified." The contract's compensation provisions are based on a unit system. Under the system, the school board assigns each teacher a certain number of units according to his or her years of experience, amount of education, and service in various activities. The board then multiplies the teacher's total number of units by a negotiated unit value to arrive at the teacher's salary.

When the 1992–93 school year began, the parties had not yet negotiated a successor agreement. In calculating the teachers' salaries for the year, the school board did not give raises to reflect an added year of experience. It did, however, increase salaries for those teachers who had received additional training during the previous year.

The union filed an unfair labor practice charge with the PELRB, demanding that the school board follow all of the provisions of the CBA in calculating salaries. After a hearing, the PELRB ruled in the union's favor. It distinguished the CBA's unit system from more traditional salary schedules and noted that the voters at the 1992 Alton annual meeting had approved a school district budget containing sufficient funds to pay for the raises the union sought. It also stated that the contract's duration clause "carries the employer's contractual obligations forward." The school board appealed.

Meanwhile, the 1993–94 school year began, and the school board again paid the teachers without regard for increased experience. Moreover, the school board gave no raises for additional training, and the budget it submitted to the 1993 Alton annual meeting did not include money for experience or education raises. The voters attending the meeting, however, amended the budget to include such funds and approved it in that form. The union filed another unfair labor practice charge and the PELRB again ruled for the union, relying on the voters' actions at the town meeting to distinguish the case from our decision in *Milton*. The school board appealed, and we consolidated the two cases for briefing and oral argument.

█ The first issue we address is whether the legislative body of the public employer—that is, the town voters—ratified the CBA's automatic renewal clause. A ratified automatic renewal clause would cause all of the terms of the CBA to continue in full force and effect, thus securing the raises for the teachers. We hold that the voters did not ratify the clause.

The record contains the warrant for the 1991 Alton annual meeting, the relevant meeting for the CBA at issue. Article IV reads:

> To see if the District will vote to raise and appropriate the sum of $60,360, consisting of $54,242 for salaries, $5,040 in fixed charges and $1,078 for professional improvement, to fund all cost items relating to teacher[s'] salaries and fringe benefits for the 1991–92 school year, resulting from good faith negotiations with teachers and which represent the negotiated increases over 1990–91 salaries and fringe benefits, said increases to be offset, in part, by $9,875 reimbursement to the District by the teachers for co-payment of health insurance premiums.

This article fails to apprise the Alton voters of the automatic renewal clause or warn them of its significant financial consequences. As this court stated in *Sanborn*, 133 N.H. at 520, 579 A.2d at 286, "ratification by the principal, in this case the school district voters, requires full knowledge of the financial terms of the collective bargaining agreement." The PELRB made no finding with respect to ratification of the automatic renewal clause, but neither the warrant nor any other item in the record could support a finding that the voters had full knowledge of the clause. We accordingly hold the clause unenforceable. *See Milton*, 137 N.H. at 244, 625 A.2d at 1059; *Sanborn*, 133 N.H. at 522, 579 A.2d at 287. "[T]he citizens of the district or municipality should know what demand the [CBA]

places upon public funds." *Sanborn*, 133 N.H. at 521, 579 A.2d at 286.

■ ■ Because the CBA's automatic renewal clause is not binding on the parties, the contract expired on its termination date, August 31, 1992. The parties' obligations to one another are therefore governed by the doctrine of maintaining the status quo. The union acknowledges that a school board is not obligated to pay step increases to teachers during the status quo period, *Milton*, 137 N.H. at 246–47, 625 A.2d at 1061, but argues that the salary increases for additional years of experience under the CBA's unit system are significantly different from step increases. We disagree. Under both the unit system of the parties' expired contract and the more traditional salary schedule found in the *Milton* CBA, a teacher's salary will increase by a specified amount each year until the teacher attains a certain level of experience. The union attempts to distinguish *Milton* by pointing out that the unit system is contained within the body of the CBA and not appended to it in the form of a salary schedule; in addition, unlike many salary schedules, no dates of application appear alongside the description of the system. We consider such distinctions irrelevant. They in no way alter the core similarity between the raises sought in this case and the step increases treated in *Milton*. Our decision in *Milton* did not depend on the raises being described in an appended salary schedule labeled according to the year of operation. The raises at issue here are experience increases, comparable to step increases. We therefore find the *Milton* holding applicable.

■ A raise based on additional training, however, is not an experience increase and cannot be considered its equivalent for purposes of defining and maintaining the status quo. It was a condition of the teachers' employment that time and money invested outside the classroom in course work would be rewarded by a salary increase the following year. Experience raises cannot be equated. Denying education raises may result in differently qualified teachers being paid the same salary. No comparable unfairness occurs when experience increases are withheld unless new, inexperienced hires are paid the same as second-year teachers—something the union has not alleged. We conclude that a school board's unilateral refusal to pay education increases during a status quo period violates its duty under RSA 273-A:5, I(e) to negotiate terms and conditions of employment and, therefore, gives the public employer an unfair advantage in the bargaining process.

■ The question remains whether the votes of the 1992 and 1993 Alton town meetings approving funds for experience increases

required the school board to pay these increases during the status quo period. We hold that they did not. Under RSA chapter 273-A, the legislative body of the public employer has but two functions in the collective bargaining process: (1) approving or rejecting cost items submitted to it, RSA 273-A:3, II(b); and (2) accepting or rejecting a factfinder's report, RSA 273-A:12, III (1987). The vote of the legislative body is binding only with respect to cost items. *See Appeal of Derry Educ. Assoc.*, 138 N.H. 69, 71–72, 635 A.2d 465, 467 (1993). Cost items, as noted above, are defined as "any benefit *acquired through collective bargaining* whose implementation requires an appropriation by the legislative body of the public employer with which negotiations are being conducted." RSA 273-A:1, IV (emphasis added). The experience raises the town meetings voted to fund were not benefits acquired through collective bargaining. The benefits acquired through collective bargaining were contained in the parties' last CBA. *See City of Franklin*, 137 N.H. at 729–30, 634 A.2d at 1004–05. They were negotiated for a limited period of time—the length of the contract. When the contract ended, so did the benefits acquired through collective bargaining. Were we to interpret RSA 273-A:1, IV otherwise, legislative bodies could determine in the first instance some of the most significant terms of the teachers' employment. This would frustrate the entire collective bargaining process set forth in RSA chapter 273-A. As we stated in *Derry*, 138 N.H. at 71, 635 A.2d at 467, "[s]chool boards, not legislative bodies, have authority to negotiate and enter into collective bargaining agreements."

 Because there were no cost items to present to the 1992 and 1993 Alton town meetings, the funding votes regarding experience increases had no effect on the school board's obligations. "Only cost items shall be submitted to the legislative body of the public employer for approval." RSA 273-A:3, II(b); *see City of Franklin*, 137 N.H. at 729–30, 634 A.2d at 1004–05; *Milton*, 137 N.H. at 244, 625 A.2d at 1059. In the absence of a collective bargaining agreement, the status quo doctrine governs a school board's duty to teachers. As explained above, this duty includes payment of education, but not experience, increases. Accordingly, we reverse the portion of the PELRB's decisions ordering payment of experience increases, and affirm that portion ordering payment of education raises.

## II. The Rochester Appeal

The last CBA of the Rochester School Board and the Rochester Federation of Teachers provided for salary determination according

to each teacher's level of experience, and the PELRB was asked to decide whether the school board must pay step increases during the status quo period. The agreement contains both a termination date (August 31, 1993) and an automatic renewal clause, which reads: "The provisions of this contract shall continue in effect until successor agreement is negotiated as long as negotiations are in process." The PELRB termed this provision a cost item and found that the legislative body of the public employer, the city council, had never ratified it. Citing *Milton* and *Sanborn*, the PELRB concluded that the school board was not required to pay step increases during the status quo period. The union appealed.

As noted above, a school board is not obligated to pay step increases during the status quo period in the absence of an enforceable automatic renewal clause. *Milton*, 137 N.H. at 246–47, 625 A.2d at 1061. The union's case thus depends on whether the CBA's automatic renewal clause is enforceable. We hold that it is not.

■■■ First, we conclude that the clause is a cost item. Like the clause this court addressed in *Milton*, it is a "benefit acquired through collective bargaining whose implementation requires an appropriation by the legislative body of the public employer with which negotiations are being conducted." RSA 273-A:1, IV; *see Milton*, 137 N.H. at 243, 625 A.2d at 1058. It should be noted that the Rochester clause was designed to extend the CBA only so long as the parties were still negotiating, unlike the Milton clause. This distinction, however, does not alter the character of the Rochester clause as a cost item. Like the Milton clause, it was meant to continue the previous year's CBA. Consequently, "[a]s each year's contract obviously contains cost items, the . . . clause must be classified as a cost item," *id.* at 243, 625 A.2d at 1059, and must be ratified to be enforceable, *id.* at 244, 625 A.2d at 1059.

■■■ Next, we affirm the PELRB's finding that the city council never ratified the clause. Ratification requires "full knowledge" of a CBA's cost items. *Sanborn*, 133 N.H. at 520, 579 A.2d at 286. The party alleging ratification must, at a minimum, demonstrate that the legislative body knew of the cost items' financial implications at the time it approved them. *Cf. City of Franklin*, 137 N.H. at 728, 634 A.2d at 1003-05. As we noted in our discussion of the *Alton* appeals, the warrant article to the legislative body must apprise them of the automatic renewal clause and warn them of its financial impact. We would uphold as enforceable an automatic renewal clause if the legislative body chose to approve the cost items in the CBA after such apprisal. *See Sanborn*, 133 N.H. at 522, 579 A.2d at 287.

 We recognize the impossibility of placing a precise dollar figure on an automatic renewal clause; however, estimates and projections of future costs are beyond neither a school board's abilities nor a city council's grasp. Such estimates and projections could sufficiently warn the council members of the financial burden imposed by such a clause and would therefore have satisfied the "full knowledge" requirement for ratification. Here, no such estimates or projections were submitted to or considered by the council members. Moreover, the PELRB found: "The evidence presented fails to establish that the Council was presented with, considered or approved funding for any period(s) beyond the 1992–93 school year." The record amply supports the PELRB's finding.

 The union asserts that it met its burden of proving ratification by showing that in the 1986–87 school year, the school board funded step increases during a status quo period under an identically worded automatic renewal clause, thus establishing that the city council understood the financial implications of the present clause when it approved the school board's budget. The union's evidence on this latter point is that six people were council members both in January 1987 and in August 1990. This argument does not withstand scrutiny. Six people do not make a majority on the twelve-member council. More importantly, knowledge of an automatic renewal clause's consequences in one year does not prove knowledge concerning its effect in later years. As discussed above, ratification requires knowledge, to some reasonable degree, of the *extent* of a cost item's financial burden, not just the fact of a burden.

 The union also contends that the teachers should not be penalized for the school board's failure to properly submit the duration clause to the city council for ratification. *See* RSA 273-A:5, I(e) (failure to submit cost items constitutes unfair labor practice). This argument was not properly raised below and therefore is not preserved for appellate review. RSA 541:4 (1974); *Appeal of Matthews*, 136 N.H. 221, 226, 614 A.2d 1061, 1064 (1992). We note, however, that a union's complaint of an unfair labor practice is time-barred unless it is filed within six months of the date of the alleged violation. RSA 273-A:6, VII (1987). If the school board committed an unfair labor practice, the violation took place in 1990, five years ago, when the school board submitted its budget to the city council.

 Finally, the union argues that the PELRB erred in deciding its motion for reconsideration by a different three-member panel of the board than that which presided at the hearing and signed the

original order. The union invokes no constitutional provisions to support its contention, thus waiving this type of argument, and the case it cites, *McDonough v. Kelly*, 329 F. Supp. 144 (D.N.H. 1971), is readily distinguishable. Moreover, nothing in RSA chapter 273-A, governing public employee labor relations, prohibits the action complained of here. RSA 273-A:2, III (1987), for example, simply provides that "[t]hree members of the board shall constitute a quorum." Significantly, neither the PELRB's original decision nor its decision on the union's motion for reconsideration depended on the resolution of any testimonial conflict. This case is thus unlike *Petition of Grimm*, 138 N.H. 42, 46–48, 635 A.2d 456, 459–60 (1993), in which the failure of board members to attend a hearing rendered them unable to resolve a crucial credibility contest. We affirm the PELRB's decision.

### III. The Conway Appeal

Four unions are involved in this appeal: (1) a union of groundskeepers, cafeteria workers, custodians, and bus drivers, represented by the American Federation of State, County, and Municipal Employees (AFSCME); (2) the Conway Education Association (CEA); (3) the Conway Educational Support Personnel (CESP); and (4) the Conway Administrators Association (CAA). The school board of the Conway School District had negotiated CBAs with AFSCME, CEA, and CESP, but by the start of the 1992–93 school year, the contracts had all expired. None contained an automatic renewal clause. The school board has not yet negotiated a CBA with CAA; the parties' employment relationship is governed by a set of policies written by the school board.

The CAA school board policies, and each CBA, contain a provision regarding health insurance. The CAA provision states that the school board "agrees to pay the cost" of a single membership in a particular health plan or its equivalent, or a family membership minus $9.75 per month. The CEA and CESP provisions are similar. The AFSCME provision, on the other hand, states that the school board "agrees to pay the cost" of a single membership in a particular plan or its equivalent, but "agrees to pay up to" a certain dollar figure "against the cost of" a two-person or family membership.

In January 1993, the school board petitioned the PELRB to determine whether it must continue providing the level of health insurance benefits promised in the three CBAs and the CAA policy. The cost of maintaining those benefits had increased, and the legislative body—the town voters—had yet to specifically approve additional expenditures to cover the added cost. The school board

argued that it had no authority to pay the higher insurance premiums without the voters' approval, and suggested that it need only maintain the level of premiums it had been paying. The PELRB disagreed, ruling that the status quo doctrine required maintenance of the level of benefits the members of the bargaining units had been receiving. The school board appealed. We affirm.

Just as we held in the *Alton* appeals, discussed above, the voters' actions during the status quo period are irrelevant to the school board's obligations to the bargaining unit members because the benefits at issue are not "benefits acquired through collective bargaining" and, thus, are not cost items. *See* RSA 273-A:1, IV. The school board's obligations are thus governed by the doctrine of maintaining the status quo. We note that this doctrine applies to CAA, which has yet to negotiate a contract, in the same way that it applies to AFSCME, CEA, and CESP, whose contracts have expired. The school board's responsibility to maintain the status quo derives from its duty to negotiate in good faith the terms and conditions of employment. *See* RSA 273-A:3, I, :5, I(e). This duty does not depend on the existence of an expired contract. A school board must negotiate with a union so long as the union has been certified by the PELRB "as the exclusive representative of the bargaining unit." RSA 273-A:3, I. Regardless of whether the parties have already negotiated a CBA, a unilateral change in conditions of employment is, in effect, a refusal to negotiate those terms.

We hold that the health insurance benefits received by the bargaining unit members pursuant to the school board's policies and the CBAs are conditions of employment and, therefore, that the school board must continue to provide these benefits during the status quo period regardless of the cost. In *Milton*, 137 N.H. at 247, 625 A.2d at 1061, we stated that "the conditions under which the [bargaining unit members] worked endure throughout the collective bargaining process." Just as the members received a particular salary from their employer, they also received a particular level of insurance benefits. To maintain the status quo, the school board must continue the benefits without a change in substance or effect. As the PELRB ruled, if the school board paid the full cost of membership in certain health insurance plans less a specified co-payment, the school board must continue to do so. If the board paid only a defined dollar amount toward the cost of insurance, it need only continue that contribution.

These cases are the latest in a series of "status quo" cases. This body of law should provide a fair matrix for the parties to

collective bargaining to be able to predict the consequences of allowing their employment relationships to drift into the "level playing field" of the "status quo." The consequences are judicially determined and have been, and will be, unsatisfactory to one party or another. It is important to state that the parties to collective bargaining are in a position to settle, in advance, the consequences of allowing the term of the collective bargaining agreement to end without a new agreement in place. To avoid the judicially imposed "status quo" there are three collectively bargained alternatives. The first, as was attempted in *Alton*, is the "evergreen" provision, where the collective bargaining agreement, at the end of the stated term, renews itself automatically until the successor agreement is ratified. Obviously, as we see above, this agreement must be ratified by the legislative body, said body being fully informed of its terms and aware of its financial impact, or, in bargaining parlance, *Sanbornized.* The second is the limited "evergreen" provision that we see in the Rochester contract. This provides for an extension of the contract during the period of negotiation. This also must have the informed ratification of the legislative body and bears the risk of the specter of judicially imposed "status quo" should bargaining be abandoned. The third is a "status quo" clause where the precise terms of the post-term relationship are spelled out by the parties. This is also a cost item requiring informed legislative ratification, but, being bargained, would avoid further dispute.

*Affirmed in part; reversed in part.*

BROCK, C.J., and BATCHELDER, J., concurred specially; the others concurred.

BROCK, C.J., and BATCHELDER, J., concurring specially: We concur specially in the result reached by the court in these cases and agree with the court's reasoning except insofar as it relates to the concept of status quo. Our position in this regard was stated by us in our dissent in *Appeal of Milton School District*, 137 N.H. 240, 248, 625 A.2d 1056, 1062 (1993). Recognizing the continuing viability of *Milton* as the law in New Hampshire, we concur in the result.