NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Cheshire
No. 2019-0134

MONADNOCK REGIONAL SCHOOL DISTRICT

v.

MONADNOCK DISTRICT EDUCATION ASSOCIATION, NEA-NH

Argued: November 20, 2019
Opinion Issued: July 8, 2020

Drummond Woodsum & MacMahon, of Manchester (James A. O'Shaughnessy and Demetrio F. Aspiras on the brief, and Mr. O'Shaughnessy orally), for the plaintiff.

NEA-New Hampshire, of Concord (Lauren Snow Chadwick and Esther Kane Dickinson on the brief, and Ms. Chadwick orally), for the defendant.

HANTZ MARCONI, J. The defendant, Monadnock District Education Association, NEA-NH (the Association), appeals an order of the Superior Court (Ruoff, J.) granting summary judgment to the plaintiff, Monadnock Regional School District (the District), and denying the Association's cross-motion for summary judgment. The superior court ruled that $392,381 in unexpended appropriations set aside over a period of four years pursuant to the parties' collective bargaining agreement had lapsed. See RSA 32:7 (2000) (amended 2017). We reverse and remand.

The parties stipulated to the following facts.  The District is a duly constituted municipal corporation, specifically, a cooperative school district established pursuant to RSA chapter 195.  The Association is the exclusive labor representative of all members of the bargaining unit in the District, which includes high school department heads, classroom teachers, school-assigned counselors, librarians, specialists, speech education teachers, media generalists, and elementary teaching assistant principals.  The District and the Association were parties to a collective bargaining agreement (CBA) that was in effect from July 1, 2012, to June 30, 2016.

Article 9.1 of the CBA contained the parties' agreement as to health insurance.  It stated, among other things, that the District "will budget $2,300,000 for the first year of this agreement for health insurance," and that the District "agree[d] to fund the health care budget amount by the lesser of the insurance provider's average 'guaranteed maximum rate' or 5% for each additional year of the agreement."  It stated further that the Association was "responsible for selecting the insurance plans and determining the amount of contribution for each eligible employee."  Finally, as is most relevant to this appeal, Article 9.1 established a health insurance "pool," specifying that "[a]ny amount of money in the healthcare budget not expended from the [District's] contribution to annual healthcare premiums and buyout payments will be placed in a pool to offset healthcare coverage for [employees] electing plans that exceed the District's allotment per employee."  Article 9.1 further provided that monies from the pool "will be distributed equally among all employees in each plan classification to offset premium costs, as determined by the [Association]."

The District appropriated $2.3 million to fund employees' health insurance benefits for 2012-2013, the first year of the CBA.  Although the funds appropriated would have been sufficient to satisfy 100% of each employee's health insurance premiums for that year, the Association determined that employees should bear 15% of the premium costs and that the District should pay 85%.  Accordingly, as of June 30, 2013, the end of the 2012-2013 fiscal year for the District, see RSA 197:1 (2008), $213,655 of the $2.3 million remained unspent.  That money was placed in the "pool" called for in Article 9.1.

The District continued to appropriate funds for employees' health insurance benefits for each of the subsequent three years of the CBA.  For each of those three years, the Association determined that employees should pay 10% of yearly premium costs and the District should pay 90%.  As a result, there was a surplus of $192,309 from the CBA's second year, and a surplus of $154,633 from the CBA's third year.  When combined with the first year's surplus, the total amount of pool funds was approximately $560,000 going into the 2015-2016 fiscal year, which was the CBA's fourth and final year.

2

That year, the parties reached an agreement on a successor CBA that contained a provision whereby the pool funds remaining at the expiration of the current CBA would be used to fund health insurance costs during the successor CBA. The District's legislative body, however, voted to not fund it, and as a result no successor CBA went into effect. When the successor agreement did not go into effect, the Association requested, prior to the end of the 2015-2016 fiscal year, that the pool funds be used to reimburse employees for premium payments made in the current fiscal year as well as the three prior fiscal years. In June 2016, the District voted to use some of the pool funds to reimburse employees for their 2015-2016 premium payments, but refused to reimburse employees for prior years' payments. After the employees were fully reimbursed for their 2015-2016 premium payments, the balance of the pool funds was $392,381.

The Association filed unfair labor practice charges with the Public Employee Labor Relations Board (PELRB), arguing that the CBA required the District to reimburse employees' premium payments for the first three years of the agreement. The parties agreed to submit the dispute to arbitration, which, per the terms of the CBA, "shall not be binding on either party, but shall be advisory only except when the parties have mutually agreed . . . that the arbitrator's decision shall be final and binding." The arbitrator rendered a decision awarding the pool funds to the Association and/or its members. The CBA stated that, "[u]pon receipt of the advisory arbitration award, the School Board shall meet within twenty (20) days of the receipt of the award to accept or reject the recommendation of the arbitrator."

The District did neither. Instead, it filed this declaratory judgment action, arguing that, despite the arbitrator's award, "it would . . . be unlawful to transfer th[e pool] funds to the Association" because "the funds in the pool lapsed in prior years pursuant to RSA 32." The parties later filed cross-motions for summary judgment on a set of stipulated facts. The trial court granted the District's cross-motion and denied the Association's.

The court stated that, under RSA 32:7, ordinarily "a school district cannot retain unexpended funds from year to year without voter authorization." The trial court then discussed the statutory exceptions to the lapse rule enumerated in RSA 32:7 and determined that "[t]he only exception that could apply to the case at bar is RSA 32:7, I." The court ultimately ruled, however, that RSA 32:7, I, did not prevent the funds at issue from lapsing. The trial court interpreted RSA 32:7, I, to provide an exception from lapse only to legally enforceable obligations that arise prior to the end of a given fiscal year. Applying this interpretation of RSA 32:7, I, and construing the CBA without deference to the arbitrator's interpretation, the court concluded that "[t]he CBA did provide a legally enforceable obligation in regard to the pool funds, but that obligation did not arise during any of the . . . years . . . concerned, as the Association did not seek [to] offset [the cost of premiums] from the pool funds"

3

during those years.  The Association filed a motion for reconsideration, to which the District objected.  The trial court denied the Association's motion, and this appeal followed.

The primary issue presented by the Association's appeal is whether the trial court erred in granting the District's cross-motion for summary judgment, and denying the Association's, on the basis that the funds at issue lapsed pursuant to RSA 32:7.  In reviewing rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law.  JMJ Properties, LLC v. Town of Auburn, 168 N.H. 127, 129 (2015).  If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment.  Id. at 129-30.  If, as in this case, the parties filed cross-motions for summary judgment on a set of undisputed facts, we need only review, de novo, the trial court's application of the law to the facts.  Id. at 130.

Resolution of the issue before us requires statutory interpretation.  We review matters of statutory interpretation de novo.  Id.  This court is the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole.  Id.  We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used.  Id.  Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation.  Id.  Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy to be advanced by the entire statutory scheme.  Id.

RSA chapter 32 pertains to municipal budgets.  Olson v. Town of Grafton, 168 N.H. 563, 567 (2016); see RSA ch. 32 (2019).  It "was designed to control the appropriation and expenditure of money in municipalities including school districts."  Board of Selectmen v. School Bd., 113 N.H. 598, 600 (1973); see RSA 32:1 (stating that a purpose of RSA chapter 32 is "to establish uniformity in the manner of appropriating and spending public funds in all municipal subdivisions to which this chapter applies"); see also RSA 32:2 ("RSA 32:1-13, shall apply to all . . . cooperative school districts . . . .").  In accordance with the chapter's purpose, RSA 32:7 provides that "[a]ll appropriations shall lapse at the end of the fiscal year and any unexpended portion thereof shall not be expended without further appropriation, unless" an enumerated statutory exception within RSA 32:7 applies.  RSA 32:7; see also RSA 197:1 ("A meeting of every school district shall be held annually between March 1 and March 25, inclusive, . . . for raising and appropriating money for the support of schools for the fiscal year beginning the next July 1 . . . .").  Thus, under RSA 32:7, a school district cannot carry unexpended

appropriations from one fiscal year into the next unless the voters authorize a "further appropriation" or an exception applies.

One such exception is contained in RSA 32:7, I. The trial court determined that this exception was the only avenue by which the lapse of the unexpended pool funds could have been prevented at the end of each fiscal year; however, the court concluded that the exception did not save the funds from lapsing. The Association does not dispute that the exception in RSA 32:7, I, is the only statutory exception that could have applied in this case. The Association does argue, however, that the trial court erred in ruling that RSA 32:7, I, did not save the unexpended pool funds from lapsing at the end of each fiscal year.

Looking first to the text of RSA 32:7, I, see JMJ Properties, 168 N.H. at 130, we note that the statute prevents the lapse of unexpended funds appropriated for a given fiscal year when the unexpended "amount has, prior to the end of that fiscal year, become encumbered by a legally-enforceable obligation, created by contract or otherwise, to any person for the expenditure of that amount," RSA 32:7, I. Ascribing the plain meaning to the words used in the statute, we construe RSA 32:7, I, to prevent the lapse of an unspent portion of an appropriation if the following two conditions are satisfied. First, the unspent funds must be encumbered by a legally enforceable obligation for their expenditure. See id. Second, the obligation must attach to the funds before the end of the fiscal year for which they were appropriated. See id.

The obligation required may be "created by contract." RSA 32:7, I. A collective bargaining agreement is a contract. Appeal of Alton School Dist., 140 N.H. 303, 306 (1995). Thus, as the trial court recognized, an obligation created by the CBA could have prevented the pool funds from lapsing under RSA 32:7, I. Whether such an obligation was in fact created requires us to interpret the CBA.

Before turning to that interpretation, however, we address an argument raised by the Association regarding the proper standard of review. The Association argues that the superior court erred in interpreting the CBA de novo rather than deferring to the interpretation of the CBA rendered by the arbitrator. We disagree; the deferential standard of review normally applied to arbitral interpretations of collective bargaining agreements does not apply in this case.

Although we normally interpret contractual provisions de novo, "the general rule is that the interpretation of a CBA is within the province of the arbitrator." Univ. Sys. of N.H. Bd. of Trs. v. Dorfsman, 168 N.H. 450, 457 (2015) (quotation omitted). That is because, ordinarily, by including an arbitration clause in their CBA, the parties choose to have an arbitrator settle disputes concerning constructions of the CBA. Appeal of Merrimack County,

156 N.H. 35, 40 (2007). "'Because the parties have contracted to have disputes settled by an arbitrator . . . , it is the arbitrator's view . . . of the meaning of the contract that they have agreed to accept.'" Id. (quoting Paperworkers v. Misco, Inc., 484 U.S. 29, 37-38 (1987)). Thus, in reviewing an arbitral interpretation of a collective bargaining agreement, the court's task is "ordinarily . . . limited to determining whether the arbitrator's construction . . . is to any extent plausible." Id. (first alteration in original) (quotation omitted).

This general rule of deference to arbitral interpretations of CBAs recognizes that the "policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards," and that "plenary review by a court of" the CBA "would make meaningless . . . provisions [in the CBA] that the arbitrator's decision is final." Steelworkers v. Enterprise Corp., 363 U.S. 593, 596, 599 (1960). See generally Rizzo v. Allstate Ins. Co., 170 N.H. 708, 714 (2018) (discussing benefits of arbitration). These policies are not advanced, however, by deferring to an arbitrator's interpretation of a CBA rendered in a nonbinding capacity.

Although the arbitrator decided, based in part upon his interpretation of the CBA, that the pool funds should "be used to reimburse bargaining unit employees for . . . premium costs they paid in each of the first three years of the contract," it is undisputed that this decision was nonbinding. Article X of the CBA, which governs grievance procedures, states that if a grievance is referred to arbitration, "[t]he arbitrator's decision shall not be binding on either party, but shall be advisory only except when the parties have mutually agreed" otherwise. Furthermore, in the stipulated facts submitted to the trial court alongside the parties' cross-motions for summary judgment, the parties agreed that, "[p]er the terms of the CBA, the arbitration was non-binding."

Parties to a contract generally have "the freedom to agree to binding or non-binding alternative dispute resolution." Rizzo, 170 N.H. at 715. The nonbinding nature of the arbitration process provided for in the CBA "clearly indicates that the parties did not bargain for the arbitrators' final interpretation of the contract." Appeal of Board of Trustees of U.S.N.H., 129 N.H. 632, 635 (1987); see also School Dist. #42 v. Murray, 128 N.H. 417, 420 (1986) ("[T]he extent of an arbitrator's jurisdiction depends upon the extent of the parties' agreement to arbitrate."); Appeal of Merrimack County, 156 N.H. at 40. Because the arbitrator's interpretation of the CBA was nonbinding, we do not agree with the Association that the superior court erred by affording no deference to it. See Appeal of Campton School Dist., 138 N.H. 267, 270 (1994); Appeal of Hooksett School Dist., 126 N.H. 202, 204 (1985) (per curiam) (holding that PELRB had jurisdiction to interpret the CBA where "the language of the teachers' contract does not provide for final or binding arbitration or other final disposition that is binding upon the parties"). The appropriate standard of review for the CBA, in the context of this case, is de novo.

6

We now turn to our review of the CBA. We apply the general rules of contract interpretation in doing so. See Behrens v. S.P. Constr. Co., 153 N.H. 498, 500 (2006); Appeal of Alton School Dist., 140 N.H. at 306. The interpretation of a contract is ultimately a question of law for this court to decide; thus we review the trial court's interpretation of the CBA de novo. See Town of Pembroke v. Town of Allenstown, 171 N.H. 65, 69 (2018). When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. Id. at 70. We give an agreement the meaning intended by the parties when they wrote it. Behrens, 153 N.H. at 503. Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the agreement. Id.

As noted above, Article 9.1 of the CBA set forth the parties' agreement on health insurance. It included an agreement that the District would appropriate $2.3 million for health insurance for the first year of the CBA, and, for each subsequent year, would "fund the health care budget amount by the lesser of the insurance provider's average 'guaranteed maximum rate' or 5% for each additional year of the agreement." The Association was "responsible for selecting the insurance plans and determining the amount of contribution for each eligible employee."

Article 9.1 also set forth the parties' agreement regarding the pool funds:

Any amount of money in the healthcare budget not expended from [the District's] contribution to annual healthcare premiums and buyout payments will be placed in a pool to offset healthcare coverage for [employees] electing plans that exceed the District's allotment per employee. Monies will be distributed equally among all employees in each plan classification to offset premium costs, as determined by the [Association]. In no case will an employee receive more money than the cost of an annual plan premium.

Each sentence in the portion of Article 9.1 containing the parties' agreement regarding the pool funds used mandatory language. The first sentence of Article 9.1 stated that any amount of money remaining in the annual healthcare budget after the District made its contribution to annual premiums and buyout payments "will be placed in a pool." (Emphasis added.) The second sentence of this Article stated that monies in the pool "will be distributed" to employees. (Emphasis added.) The plain meaning of a phrase stating that a certain event "will" occur is that the occurrence of the event is mandatory or obligatory, not permissive or discretionary. See Bigwood v. Merrimack Village District, 108 N.H. 83, 87 (1967); see also Behrens, 153 N.H. at 503. Accordingly, the provision in Article 9.1 stating that remaining funds in the annual healthcare budget "will be placed in a pool" created an obligation to pool those funds, and the provision stating that funds in the pool "will be

distributed" created an obligation to distribute the pool funds.  See Bigwood, 108 N.H. at 87.

Article 9.1 also set forth certain requirements as to the manner in which the pool funds were to be distributed.  The Article stated that the funds were to be dispensed "equally among all employees in each plan classification to offset premium costs, as determined by the [Association]."  It also stated that employees could not "receive more money than the cost of an annual plan premium."  Construing Article 9.1 as a whole, we conclude that the Article created an obligation to distribute pool funds to employees but gave the Association discretion in implementing those distributions, so long as: (1) all employees within each plan classification received an equal distribution; (2) the distributions were made to offset premium costs; and (3) no distribution resulted in an employee receiving a greater amount than the cost of an annual premium.

Construing these obligations and RSA 32:7, I, together, we conclude that the funds at issue did not lapse.  As discussed, to prevent lapse under RSA 32:7, I, two conditions must be satisfied.  First, the unspent portion of the appropriation must be encumbered by a legally enforceable obligation for its expenditure.  See RSA 32:7, I.  Second, the obligation must attach to the funds before the end of the fiscal year for which they were appropriated.  See id.  Here, both conditions of RSA 32:7, I, were satisfied as to the amount of each year's health insurance appropriation that remained unexpended at the end of the fiscal year.

First, the unexpended health care funds that were budgeted each year were placed in the pool.  The funds in the pool were encumbered by an obligation that such funds "will be distributed" to employees.  This constituted an enforceable obligation for the expenditure of those funds under RSA 32:7, I.  Second, Article 9.1 also created an obligation that any money left in the healthcare budget after the District made its contribution to annual premiums and buyout payments "will be placed in a pool."  Because the pool funds were encumbered by an obligation for their expenditure, and because each year's unexpended health insurance appropriation was required to be placed in the pool once the District satisfied its yearly contribution to premiums and buyout payments, the required obligation arose each year no later than at the moment the District satisfied its yearly contribution.  Thus, both conditions of RSA 32:7, I, were satisfied as to the unspent amount of each year's health insurance appropriation.

For the 2012-2013 fiscal year, for example, the first fiscal year in which the CBA was operative, the District appropriated $2.3 million to fund the healthcare budget.  After the District made its required yearly contribution to employee premiums and buyouts, which was before the end of the fiscal year, $213,655 remained from that appropriation.  The CBA obligated these funds to

8

be "placed in [the] pool," and further obligated that pool funds "be distributed." The obligation under the CBA that the pool funds be distributed to employees constituted an enforceable obligation for the pool funds' expenditure under RSA 32:7, I. Because this obligation applied to funds in the pool, and because the District was required to place the $213,655 remaining from the 2012-2013 appropriation in the pool after it satisfied its contribution to annual premiums and buyout payments, which occurred before the end of the fiscal year, that fiscal year's unexpended health insurance appropriation did not lapse. See id.

The same operative facts existed in the 2013-2014 fiscal year as well as the 2014-2015 fiscal year. For each of those years, the District appropriated money to fund the yearly healthcare budget. There was money remaining in each year's healthcare budget after the District made its contribution to employee premiums and buyout payments. The amount of money remaining was required to be pooled, and, once pooled, was subject to an obligation that it be distributed to employees. Thus, the unexpended portion of each year's health insurance appropriation did not lapse.[1] See id.

The District argues that the funds at issue lapsed because the Association, with the exception of 2015-2016, "never requested access to the Pool Funds [and] never requested that the District use the Pool Funds to offset its members' premiums." The District essentially argues that, because "no other action was taken to encumber the funds," the Association was required to actually seek a distribution of pool funds in a given fiscal year in order for that year's unexpended appropriation to be saved from lapse under RSA 32:7, I. (Bolding omitted.) We do not agree. RSA 32:7, I, requires that the obligation be "enforceable," not that its enforcement be sought. RSA 32:7, I. The obligation that the pool funds be distributed to employees was established by the CBA's plain language; the Association needed to take no further action to create that obligation.

In addition, that the CBA provided for distributions to be made "as determined by" the Association does not lead us to conclude that the CBA did not create an enforceable obligation for the pool funds' expenditure. As previously noted, Article 9.1 stated that funds in the pool "will be distributed equally among all employees in each plan classification to offset premium costs, as determined by the [Association]." It further stated that "[i]n no case will an employee receive more money than the cost of an annual plan premium." Thus, as discussed, the CBA required that funds in the pool be

---

[1] The stipulated facts submitted alongside the parties' cross-motions for summary judgment do not clearly specify whether any of the monies appropriated for the 2015-2016 fiscal year remained unexpended at the end of that fiscal year. The parties stipulated that the District appropriated $2.53 million for that year's health insurance budget. To the extent any amount of that $2.53 million remained unexpended after the District made its yearly contribution to premiums and buyouts, that amount did not lapse for the reasons discussed above.

9

distributed to employees, but gave the Association the discretion to determine the amount employees would receive, so long as distributions: (1) were equalized within each classification; (2) were used to offset premium costs; and (3) did not result in an employee receiving a greater amount than the cost of an annual premium. That the Association had some amount of discretion in implementing mandatory distributions does not mean the distributions were not, in fact, mandatory.

The District also contends that "[e]ven if the Pool Funds could be deemed as having been 'encumbered' in any of the four fiscal years," RSA 32:7, I, requires the funds saved from lapse to be expended before the end of the next fiscal year. The District's argument finds no support in the text of RSA 32:7, I. Although the statute requires the <u>obligation</u> for the expenditure of the funds to arise before the end of the fiscal year for which the funds were appropriated, it places no requirements on the time at which the required expenditure must occur. <u>See</u> RSA 32:7, I.

The District argues in the alternative that, even if the funds did not lapse, it cannot lawfully provide them to the Association because "the legislative body was never put on notice that the Pool Fund would not lapse at the end of each fiscal year." The District essentially argues that the provisions in Article 9.1 governing the pool funds had to be submitted to, and approved by, its legislative body. <u>See Appeal of Sanborn Regional School Bd.</u>, 133 N.H. 513, 520-22 (1990); <u>see also</u> RSA 273-A:1, VII (2010) (amended 2014) (defining "[l]egislative body" as "that governmental body having the power to appropriate public money"). We do not agree.

"Only cost items shall be submitted to the legislative body . . . for approval . . . ." RSA 273-A:3, II(b) (2010) (amended 2013); <u>accord Appeal of Laconia Patrolman Assoc.</u>, 164 N.H. 552, 555 (2013). Thus, if a contractual provision is not a cost item, it need not be submitted to the legislative body for approval. <u>See Appeal of Milton School Dist.</u>, 137 N.H. 240, 247 (1993). Cost items are defined by statute as "any benefit acquired through collective bargaining whose implementation requires an appropriation by the legislative body of the public employer." RSA 273-A:1, IV (2010). The parties to a CBA are not bound by its cost items unless the legislative body ratifies them. <u>Appeal of Alton School Dist.</u>, 140 N.H. at 307. Ratification requires knowledge, to some reasonable degree, of the extent of a cost item's financial burden. <u>Appeal of Town of Rye</u>, 140 N.H. 323, 327 (1995). The extent need not be precisely ascertainable at the time the cost item is approved, however. <u>Id.</u>; <u>see also Appeal of Sanborn Regional School Bd.</u>, 133 N.H. at 522 ("[I]nclusion in the warrant of language apprising the voters of the financial consequences of their actions would seem to be sufficient.").

We need not decide whether the provisions of Article 9.1 establishing the pool and requiring the distribution of funds in the pool were cost items

requiring an appropriation in order to be implemented. Even assuming that they were cost items, the legislative body had sufficient knowledge of their financial burden.

The warrant article pertaining to health insurance informed the legislative body that "[t]he District will fund a total of $2,300,000 for . . . [employees'] health care costs for the first year of this contract," and that "[t]he amount contributed by the District in years two, three and four of the contract will increase by the lesser of the Guaranteed Maximum Rate increase or 5% each year." Thus, the legislative body was informed of the financial consequences of voting to fund the health insurance benefits agreed to between the District and the Association. By approving the CBA, the legislative body authorized the appropriation — and expenditure — of the money necessary to fund employees' health insurance benefits, including the provisions governing the pool funds. See RSA 32:3, I (2019) ("'Appropriate' means to set apart from the public revenue of a municipality a certain sum for a specified purpose and to authorize the expenditure of that sum for that purpose." (emphasis added)). Thus, because the legislative body approved the CBA with requisite knowledge of the financial burden required to fund employees' health insurance benefits, it must now "fund whatever benefits the [employees] decide to enjoy pursuant to [the CBA's] terms." Appeal of City of Franklin, 137 N.H. 723, 730 (1993).

In summation, we hold that the funds at issue did not lapse because they were encumbered by an enforceable obligation for their expenditure that arose prior to the end of the fiscal years for which they were appropriated. See RSA 32:7, I. We therefore reverse the trial court's ruling to the contrary.

Reversed and remanded.


HICKS, BASSETT, and DONOVAN, JJ., concurred.

11