Ballot Law Commission
No. 94-396

### APPEAL OF DONNA SOUCY
### (New Hampshire Ballot Law Commission)

November 2, 1994

*Sheehan Phinney Bass & Green,* of Manchester (*Matthew J. Lapointe* on the brief, and *William S. Green* orally), for the petitioner.

*Douglas & Douglas,* of Concord (*Robert J. Rabuck* by brief and orally), for respondent Leona Dykstra.

*Jeffrey R. Howard,* attorney general (*Monica A. Ciolfi,* assistant attorney general, by brief and orally), for the State, as *amicus curiae.*

BROCK, C.J. In November 1993, the petitioner, Donna Soucy, was declared the winner of the aldermanic election for ward 6 in the City of Manchester. Based on complaints made to the New Hampshire Ballot Law Commission (commission) of irregularities in the conduct of that election, the commission held two days of hearings and on May 31, 1994, ordered the election void, declared the seat vacant, and directed the city to schedule a new election. Soucy appealed, and we stayed the commission's order pending the issuance of this opinion. We reverse.

By letter of complaint to the commission dated November 12, 1993, amended by letter dated November 17, 1993, Manchester resident James P. Oparowske set forth nine irregularities alleged to have occurred during the November 2, 1993, election. These allegations included:

1. The names of approximately 36 individuals were crossed off on the Ward 6 voter checklist as having voted absentee, but the absentee voter list for Ward 6 indicated that absentee ballots were not received from these individuals;

2. The names of approximately 13 individuals were not crossed off on the Ward 6 checklist, even though the absentee voter list indicated that absentee ballots had been received from these individuals;

3. There was a discrepancy between the number of absentee votes cast as shown on the general municipal election return for Ward 6, and the absentee votes reported by Mr. Soucy [the moderator] on November 2, 1994 [sic]. The absentee voter checklist indicated that 202 absentee ballots were received by the City Clerk, but the total reported by the moderator was 191 absentee votes;

4. No reason was given by the moderator as to why challenged absentee votes were being challenged;

5. The moderator failed to write 'A.V.' next to the name of the absentee voters as each absentee ballot was removed from the envelope, in violation of RSA 659:52. The ballots were instead collected in a pile, and the letters 'A.V.' were recorded on the checklist at a later time;

6. The absentee ballots were not counted in accordance with RSA 659:63 in that the counting was not completed as the envelopes were opened up, and the counting was not completed in public;

7. An unspecified number of absentee ballots were crossed off the official checklist as voting;

8. Mr. Soucy permitted the Ward Clerk, Norman Gill, to leave the room in which the voting took place with six voting machine cartridges in his pocket while the matter of a broken voting machine was addressed, in violation of the requirement that votes be counted in public; and

9. Mr. Oparowske's mother, Gladys Oparowske, who received but did not return an absentee ballot, was denied the right to vote by Mr. Soucy when she arrived at the polls to vote at approximately 7 p.m. on November 2, 1993.

Mr. Oparowske's letter requested the commission to "determine if irregularities occurred" and if it found "significant irregularities did occur," to order a new election.

By letter to the commission dated January 20, 1994, unsuccessful ward 6 aldermanic candidate Leona Dykstra raised two additional irregularities. The letter alleged: (1) the ward 6 moderator, C. Arthur Soucy, was unable to discharge his duties impartially and fairly due to a conflict of interest resulting from the fact that his daughter, Donna Soucy, was a candidate for alderman in ward 6; and (2) an electronic voting machine was disabled for at least one hour on the morning of November 2, 1993, but was later used for voting even though no one from city hall was called to examine the machine.

The commission held two days of hearings: on January 21 and March 28, 1994. Because the moderator was unavailable on January 21 and apparently had not received notice of the two additional allegations raised by Leona Dykstra, the commission confined the first day of hearing to the nine irregularities raised by James Oparowske. Although Mr. Soucy was notified of the second hearing, he did not appear, and the commission proceeded to hear the remainder of the allegations.

Concerning the allegation that Gladys Oparowske was denied the right to vote, the commission found that after she entered the polling place at approximately 7:00 p.m. on November 2, 1993, but before she could vote, Mr. Soucy announced that the polling place

was closed. The absentee voter list for ward 6 compiled by the city clerk's office indicated that Gladys Oparowske's absentee ballot was not returned. The checklist at the ward 6 polling place, however, indicated that she had voted by absentee ballot. The commission found that had Mr. Soucy inquired whether Gladys Oparowske in fact had returned her absentee ballot, he would have discovered that she had not. Accordingly, the commission ruled that "because Mrs. Oparowske presented herself at the check-in table before the polls were closed, and she had not returned her absentee ballot, Mrs. Oparowske should have been allowed to vote in person."

Regarding the absentee ballots, the commission ruled that Mr. Soucy violated State election laws on six separate occasions. The commission ruled: (1) "the requirement that the name of the absentee voter be identified on the checklist during the processing of the absentee ballots, RSA 659:50, I, was not fulfilled"; (2) "[t]he procedure used by Mr. Soucy also failed to conform to the RSA 659:52 requirement that the absentee voter's name be checked off in red ink, and the letters 'A.V.' written beside the voter's name in red ink after the envelope is opened"; (3) "[t]he processing of absentee ballots also failed to conform to the requirements of law in that the processing of absentee ballots was interrupted, in violation of RSA 659:49, I(c)"; (4) "the failure to record challenges during continuous processing of the absentee ballots [was] in contravention of . . . RSA 659:51"; (5) "the manner in which the absentee ballots were counted in Ward 6 violated RSA 659:63"; and (6) "Mr. Soucy did not fulfill his statutory duty to oversee the counting of votes by the election officers under his supervision as required by RSA 659:60." The commission stated: "It is inconceivable that such substantial errors could have been made in an appropriately organized and supervised election. The Commission was both dismayed and surprised by the fact that no evidence was offered to explain how or why these irregularities may have occurred."

Regarding the allegation of conflict of interest, the commission found that Mr. Soucy is the father of Donna Soucy, who was elected as alderman in the election at issue. The commission concluded, however, that there is no statutory prohibition against a relative of a candidate serving as moderator in an election. The commission ruled that "[w]hile it would have been prudent for Mr. Soucy to have anticipated and avoided the allegations which now have been made and assigned his duties to a designee, he was not required by law to do so and did not violate the law by failing to disqualify himself as moderator."

The commission next addressed the allegation that one of the voting machines was not working for approximately one hour after the polls opened on the morning of November 2, 1993, and that Mr. Soucy acted improperly in putting the machine into service without first having the machine inspected by someone from city hall. The commission noted that the administrative rule setting forth the measures to be undertaken by election officials in the event that a machine becomes inoperative was not followed by Mr. Soucy. Because, however, "no evidence was introduced to show that voters were able or permitted to use the machine while it was inoperable," the commission concluded that "while perhaps a consequence of poor judgment, Mr. Soucy's failure to call in a repairman was not a violation of law."

Finally, as to the allegation that the machine cartridges on which the votes had been recorded, or the machines themselves, had been tampered with, the commission concluded that no fraud occurred. The commission found that after the polls closed, when the votes were being counted, one of the voting machines failed to process a total. At that time, Norman Gill, the ward clerk, left the room with voting machine cartridges in his pocket for several minutes, accompanied by Mr. Soucy, for the stated purpose of making a telephone call to city hall to put the machine back into operation. The commission found that "no evidence was presented that the tapes or machines were tampered with, or that votes recorded on those machines were altered." It stated: "[T]his is another circumstance in which the moderator failed to exercise appropriate judgment in the discharge of his duty to oversee the election in Ward 6 . . . . Nevertheless, while not a prudent course of action, the conduct of Mr. Soucy and Mr. Gill in this regard . . . does not constitute a violation of law."

The commission concluded:

> The Ballot Law Commission is deeply disturbed at the slipshod manner in which the Ward 6 election was conducted and supervised by the moderator, Mr. Soucy. While the record gives no proof of fraudulent conduct, it establishes that Mr. Soucy adopted a cavalier attitude and that inattention to the details of the election process was the hallmark of his service as moderator during the November 2, 1993 election. Mr. Soucy's conduct either created or contributed to the creation of many irregularities in the November 2, 1993 Ward 6 election, as enumerated above. More significant than the irregularities themselves is the degree to which they undermined public confidence in the election process—an

election process which, when undertaken in accordance with the law, is revered and admired by citizens of this State, our Country and the world.

In light of the many irregularities which were proven to have occurred in the November 2, 1993 Ward 6 election, the Commission has little confidence that the intention of the voters was accurately or appropriately reflected under Mr. Soucy's supervision. Accordingly, the Commission orders the November 2, 1993 Ward 6 aldermanic election voided, declares the Ward 6 aldermanic seat vacant, and directs the Secretary of State, the City Clerk for the City of Manchester and the Board of Aldermen to take appropriate action to conduct a new election . . . .

We first address the petitioner's threshold questions concerning the commission's jurisdiction to decide the issues before it and its authority to vacate the election. She argues that because RSA 46:3 (1991) establishes an alternative statutory appeal procedure, the commission lacked jurisdiction to hear this case. In addition, the petitioner argues that because a recount was not requested pursuant to RSA 660:1 (1986) or section 5.29 of the Manchester City Charter, Leona Dykstra was not entitled to relief from the commission. These arguments are without merit.

"Jurisdiction to hear and determine election contests is dependent on, and regulated by, statutory provision." 26 AM. JUR. 2D *Elections* § 328 (1966). Only a court or board authorized by statute or constitution has jurisdiction to hear such a contest. *Id.* In New Hampshire, the commission's authority is set out in RSA chapter 665. RSA 665:7 (1986) provides in part:

In addition to the jurisdiction of issues conveyed to the ballot law commission by other sections of this chapter, the commission shall hear and determine all disputes involving alleged violations of New Hampshire election laws of a non-criminal nature for which no specific statutory appeal procedure has already been provided.

The petitioner contends that RSA 46:3 establishes a "specific statutory appeal procedure," thereby precluding the commission from exercising jurisdiction in this matter. RSA 46:3 provides: "[The Boards of Aldermen and Councilmen] shall be the final judge of the election and qualification of its members, and, if any election is contested, shall have the same powers to ascertain the facts as the city convention have in regard to the election of mayor . . . ."

■ In accordance with basic tenets of statutory interpretation, we look first to the language of the statute. *N.H. Div. of Human Services v. Hahn,* 133 N.H. 776, 778, 584 A.2d 775, 776 (1990). RSA 665:7 does not define the term "specific statutory appeal procedure." Where statutory language is not specifically defined, "we give the language its plain and ordinary meaning, if possible. In doing so, we must keep in mind the intent of the legislation, which is determined by examining the construction of the statute as a whole, and not simply by examining isolated words and phrases found therein." *Id.* (citation omitted). RSA 665:14 (1986) provides that there may be an appeal to this court "from the decisions of the ballot law commission made under RSA . . . 665:7 . . . . Appeals under this section shall be limited to contested elections for the offices of presidential elector, governor, councilor and town and city or city ward offices voted for at general elections." RSA 665:14. The plain language of this section indicates that the commission has jurisdiction over contested elections for city ward offices. Were we to interpret RSA 665:7 to preclude the commission's jurisdiction in this matter, we would render meaningless the language of RSA 665:14. "We will not interpret the statute to produce such an illogical result." *Rix v. Kinderworks Corp.,* 136 N.H. 548, 551, 618 A.2d 833, 834 (1992) (quotation omitted). Because of our holding, we need not consider whether RSA 46:3 is an appeal procedure as envisioned by the language of RSA 665:7.

■ We also reject the argument that a recount was a necessary prerequisite to the instigation of proceedings before the commission. RSA 660:1 provides: "Any candidate for whom a vote was cast for any office at a state general election *may* apply for a recount." (Emphasis added.) Likewise, section 5.29 of the Manchester City Charter provides: "Any candidate for whom a vote was cast for any office in any election . . . who is not, according to the count first made by the officials, elected to such office . . . *may* apply to the city clerk for a recount of the votes cast . . . ." (Emphasis added.) Neither provision requires a recount before the commission's jurisdiction may be invoked.

■ Finally, we note that under proper circumstances, the commission has the authority to declare an election void and order a new election. The commission is a quasi-judicial body charged with the responsibility to carry out the objects and purposes of the election laws of this State; the authority to void an election is a remedy consistent with the broad powers granted in the statute. *See Colby v. Broderick,* 96 N.H. 316, 318, 75 A.2d 790, 793 (1950);

*see also* RSA 652:12, V (Supp. 1993) (vacancy in public office occurs if election voided by ballot law commission decision).

We turn now to the petitioner's argument that the commission's decision was erroneous as a matter of law. The petitioner argues that the commission erred in voiding the election because in the absence of fraud the irregularities must be shown to have affected the election's outcome. The respondent argues that the outcome test should not be applied where "blatantly illegal voting procedures" were used, and that the commission correctly ruled that "[w]here the outcome of an election cannot be determined with certainty because of irregularity or illegality, the remedy is to void the election and call for a new election."

■ In 1870 we established the rule that in the absence of fraud, illegal votes caused by accident or mistake which do not change the outcome will not invalidate an election. *Judkins v. Hill,* 50 N.H. 140, 142 (1870). In *Judkins,* the losing candidate for county commissioner sought to have the results of the City of Concord ward 4 election voided "upon the ground that the election was fraudulent, and the true state of the vote could not be ascertained." *Id.* at 141. The vote tallies in ward 4 were 371 for Hill, 174 for Judkins, and 1 for French. *Id.* According to Judkins, the fraud lay in the fact that while the ward moderator declared that 546 votes were cast only 519 names were checked off on the checklist, "and so the votes declared for county commissioner were 27 more than appears by the check-list to have voted." *Id.*

We held that because the number of votes at issue could not have changed the outcome, we would not disturb the results unless the discrepancy was the result of fraud. *Id.* at 142. As we explained, "[the] excess may have been caused by a failure to check all the names of persons voting" or "[t]here may also have been some double voting, and there may have been some mistake in the counting: to some of these causes, or to all combined, the discrepancy may be due." *Id.* We concluded, however, that in the absence of fraud, "[i]f illegal votes were received, but not enough to change the majority, it would not invalidate the election." *Id.*

■ Under the law of New Hampshire, therefore, to set aside an election the party challenging the results must prove either "fraud which leaves the intent of the voters in doubt or irregularities in the conduct of the [election] of such a nature as to affect the result." *Leonard v. School District,* 98 N.H. 296, 297, 99 A.2d 415, 416 (1953); *see Keene v. Gerry's Cash Mkt., Inc.,* 113 N.H. 165, 166–67, 304 A.2d 873, 874–75 (1973); *Attorney-General v. Folsom,* 69 N.H. 556, 558, 45 A. 410, 410 (1899).

The commission explicitly found that "no fraud occurred with respect to the operation of the voting machines, or the recording of votes on the machines." Moreover, the commission found that "no evidence was presented that the tapes or machines were tampered with, or that votes recorded on those machines were altered." Our review of the record indicates that the commission's findings are supported by the evidence. *See* RSA 665:14 (1986). The voting machine tally therefore shows that candidate Soucy received 1274 of the votes tallied by machine, while candidate Dykstra received 971 of the votes so tallied.

■ Turning to the disputed absentee ballots, we note that despite its finding that Mr. Soucy violated several election laws in regard to the processing of absentee ballots, the commission did not find fraud. The seal on the ward 6 absentee ballot box prepared by city hall indicates that 202 absentee ballots were cast. If all 202 absentee ballots, plus one additional vote representing Gladys Oparowske, are assumed to have been cast in favor of Dykstra, the total vote for Dykstra would be 1174. This would leave a margin of victory for Soucy of 100 votes. Even assuming, therefore, that all 203 of the challenged votes were cast for Dykstra, the outcome of the election would not change. *See Opinion of the Justices,* 116 N.H. 756, 759, 367 A.2d 209, 210 (1976). Based on the record before us, there is no doubt that candidate Soucy was the "expressed choice of the voters." *Town of Derry v. Adams,* 121 N.H. 473, 479, 431 A.2d 766, 769 (1981) (quotation omitted).

The primary responsibility for a fair and lawful election in ward 6 on November 2, 1993, rested upon the moderator, C. Arthur Soucy. In this responsibility it is only too clear that he failed miserably. His gross disregard for the provisions of this State's election laws and his general incompetence in managing the election is reprehensible and cannot be too severely condemned. As the Ohio Court of Appeals has stated:

> Each step in the most important democratic process of conducting a free election has been carefully thought out and spelled out by the legislature . . . . Each rule of action set forth for the guidance of the various persons participating in the process is equally important. That these rules be honestly, conscientiously, and carefully carried out by such officials is the true guaranty of the sanctity of the ballot box under our system of government. To countenance any other standard of conduct for these

officials is abhorrent to the concept of justice that is deep in the heart of every true American.

*Pintaric v. McHale,* 195 N.E.2d 606, 608 (Ohio Ct. App. 1964). Nevertheless, the law in New Hampshire provides that in the absence of fraud, irregularities will not render an election invalid unless they affect the result of the election. Because the irregularities found to have occurred in this case did not affect the choice of the voters as reflected by the machine tally, we reverse the commission's decision.

*Reversed.*

All concurred.