Hillsborough-northern judicial district
No. 2004-439

BEDFORD CHAPTER-CITIZENS FOR A SOUND ECONOMY & a.

v.

SCHOOL ADMINISTRATIVE UNIT #25-BEDFORD SCHOOL DISTRICT

Argued: December 9, 2004
Opinion Issued: December 29, 2004

*Flygare, Schwarz & Closson, P.L.L.C.*, of Exeter (*Daniel P. Schwarz* on the brief and orally), for the petitioners.

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Eugene M. Van Loan, III* on the brief and orally), for the respondent.

*The Law Office of Mark A. Stull*, of Manchester, (*Mark A. Stull* on the brief), for William Foote and Raymond C. Dugdale, as *amici curiae*.

GALWAY, J. The petitioners, Bedford Chapter-Citizens for a Sound Economy, Michele Corcoran, Maurice Villeneuve and Arnold Waldner, appeal the denial by the Superior Court (*Barry*, J.) of their petition for declaratory judgment brought against the respondent, School Administrative Unit (SAU) #25-Bedford School District. We affirm.

Either the parties do not dispute or the record supports the following facts. The respondent does not have its own high school. As a result, for

more than seventy years, the respondent has sent its students to Manchester high schools. Historically, the school districts of Auburn, Candia and Hooksett have also sent their students to Manchester high schools.

In 2002, the 1997 tuition agreements between the school districts of Auburn, Bedford, Candia and Hooksett (the sending districts) and the Manchester School District expired. The sending districts and the Manchester School District subsequently negotiated a twenty-year agreement. Although the voters in Auburn, Candia, Hooksett and Manchester approved the agreement, Bedford voters did not. Accordingly, while the Auburn, Candia, Hooksett and Manchester School Districts entered into the agreement in July 2003, the respondent did not. The twenty-year agreement required the Manchester School District to accept all high school students from Auburn, Candia and Hooksett, in exchange for payment of a base tuition cost per pupil and certain capital costs.

In July 2003, the Bedford School Board entered into a three-year agreement with the Manchester School District. This agreement provided that the respondent would enroll, and the Manchester School District would accept, all Bedford public high school students during the 2003-2004, 2004-2005 and 2005-2006 school years in exchange for a per pupil tuition payment. The tuition payment would be set each year according to a two-part formula. One part of the formula was for operating expenses; the other was for capital improvements.

The three-year agreement provided that in the event that Bedford voters ratified the twenty-year agreement by May 30, 2004 (later extended to June 1, 2004), the twenty-year agreement would supersede the three-year agreement.

In March 2004, Bedford School District voters were asked to vote on whether the respondent should raise and appropriate funds to build a new high school and authorize the school board to execute the twenty-year agreement with the Manchester School District. These warrant articles did not pass. The voters, however, passed other articles appropriating sufficient funds to fulfill some of the respondent's obligations under the three-year agreement with Manchester.

Soon after the March 2004 meeting, Bedford voters petitioned for a special school district meeting at which voters would again vote on whether to authorize the school board to execute the twenty-year agreement. *See* RSA 197:2 (1999). As a result, at the special meeting, which took place on June 1, 2004, voters were presented with a warrant article, which provided in pertinent part:

ARTICLE I. Shall the District authorize and direct the Bedford School Board to approve and execute, on behalf of the District, the twenty[-]year High School Maintenance (Tuition) Agreement with the Manchester School District prior to the June 2, 2004 deadline, and to submit it to the New Hampshire State Board of Education for approval pursuant to RSA 194:22 . . . .

Before the June 1 meeting, the petitioners asked the court to declare that the warrant article could pass by a simple majority of voters present. The trial court ruled that, pursuant to RSA 197:3 (1999), the article could not pass unless the ballots cast at the special meeting equaled at least one-half of the number of school district voters who were entitled to vote at the March 2004 meeting.

The sole issue on appeal is whether the trial court correctly interpreted RSA 197:3. We review the trial court's statutory interpretation *de novo*. *Monahan-Fortin Properties v. Town of Hudson*, 148 N.H. 769, 771 (2002).

We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. *Sweeney v. Ragged Mt. Ski Area*, 151 N.H. 239, 241 (2004). We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When the language of a statute is plain and unambiguous, we need not look beyond it for further indication of legislative intent. *Id.*

RSA 197:3, entitled "Raising Money at Special Meeting," provides, in pertinent part:

No school district at any special meeting shall raise or appropriate money nor reduce or rescind any appropriation made at a previous meeting, unless the vote thereon is by ballot, nor unless the ballots cast at such meeting shall be equal in number to at least ½ of the number of voters of such district entitled to vote at the regular meeting next preceding such special meeting
. . . .

RSA 197:3, I(a).

In *Childs v. Hillsborough Electric Light and Power Co.*, 70 N.H. 318 (1900), the court interpreted the predecessor to RSA 31:5 (2000), a related statute governing voting for appropriations at special town meetings. In that case, town voters were asked to pass the following resolution at a special meeting:

Resolved, that the selectmen be now authorized and directed to contract with the Hillsborough Electric Light and Power

> Company ... to relight our streets in the same manner as heretofore, covering the time from now to April 1, 1905, at a total cost to the town of thirteen dollars per lamp per annum; also to add lamps to the electric system as in their judgment the public good requires, in number not exceeding twenty-five.

*Childs*, 70 N.H. at 318 (quotation omitted).

The pertinent statute provided as follows:

> Towns may, at any legal meeting, grant and vote such sums of money as they shall judge necessary to support schools; to build and repair schoolhouses; to maintain the poor; ... to light streets; ... but no money shall be raised or appropriated at any special town meeting except by vote by ballot, nor unless the ballots cast at such meeting shall be equal in number to at least one[-]half of the number of legal voters borne on the check-list of the town at the annual or biennial election next preceding such special meeting ....

PS 40:4 (1891); *see Childs*, 70 N.H. at 323.

The court held that the resolution involved raising or appropriating money, within the meaning of the statute, because it concerned a multi-year contract by which the town promised to pay money. *Childs*, 70 N.H. at 324. As the court explained:

> To "raise" money, as the word is ordinarily understood, is to collect or procure a supply of money for use, as, in the case of a municipal corporation, by taxation or perhaps loan. Money cannot be actually given or appropriated before it is raised. A promise to give or appropriate money may be made before the money is actually procured; but in such case the promise binds the promisor to have the money on hand when it becomes due, and so, in a sense, the money is raised by the promise.

*Id.* at 324.

The court concluded that it was immaterial that the special warrant article did not expressly provide for raising and appropriating the amount of money required to fulfill the promise; the effect of the resolution was the same as if it contained such a provision. *Id.* "The town must seasonably raise or appropriate sufficient sums of money to pay for the lights in accordance with its promise. If it does not do so voluntarily, the law will step in and do it ... [such as through] a compulsory assessment and collection of taxes." *Id.*; *see also* RSA ch. 530 (1997).

The court noted that if a minority of voters could make contracts by which town money had to be paid, then the limitation that the legislature imposed upon the power to raise and appropriate money "would be useless." *Id.* "The limitation could always be avoided by simply changing the form of the act from that of raising or appropriating money to that of agreeing to pay money for the desired purpose." *Id.* The court rejected such an interpretation of the statute as unreasonable. *Id.* at 324-25.

■ Our holding in *Childs* remains good law and governs our interpretation of RSA 197:3 today. *See Frost v. Hoar*, 85 N.H. 442, 442-43 (1932) (applying *Childs* to predecessor of RSA 197:3). Pursuant to *Childs*, the special warrant article in this case involves a vote to raise or appropriate money, within the meaning of RSA 197:3, because it concerns a multi-year promise by the respondent to pay money. *See Childs*, 70 N.H. at 324-25.

We are not persuaded by the petitioners' attempts to distinguish *Childs* factually. The petitioners argue that in *Childs*, "only eight months of the projected cost of the contract had been previously appropriated," while in this case, "the entire amount to which the District would have been obligated under the [twenty-year agreement] *for capital costs* had, according to [the] District's own position, been previously appropriated under the Three-Year Agreement." (Emphasis added.) Thus, they assert, while ratifying the five-year agreement in *Childs* required further appropriations, ratifying the twenty-year agreement in this case did not.

The petitioners' argument assumes, incorrectly, that the twenty-year agreement would have required the respondent to pay only capital costs. To the contrary, the agreement also would have required the respondent to pay a base tuition cost per pupil. Thus, even if, as the petitioners allege, voters at the annual meeting in March 2004 approved funding for all of the capital costs that would have been due under the twenty-year agreement, they do not allege, the trial court did not find, and the record does not support a finding, that the voters also approved funding for all of the tuition costs that would have been due under that agreement.

The petitioners next contend that the twenty-year agreement is a "long-term" contract under RSA 194:21-b (1999) and, pursuant to RSA 194:21 (Supp. 2004), it is exempt from the requirements of RSA 197:3. We disagree.

RSA 194:21, I, permits two or more adjoining school districts to contract with one another to maintain jointly a high school or other public school and to raise and appropriate money to carry such contracts into effect. RSA 194:21, II states that approval of such an agreement may occur at

either an annual or a special meeting and that "[a] majority of voters present and voting in each component district shall be required for approval of the joint maintenance agreement."

■ Even if the petitioners correctly interpret RSA 194:21 to exempt agreements governed by that statute from RSA 197:3 and are correct that the twenty-year agreement is a long-term contract under RSA 194:21-b, RSA 194:21 does not apply to the twenty-year agreement. *See* RSA 194:21-c (1999). RSA 194:21-c expressly states that RSA 194:21 "shall not apply to the school districts of the state if any long-term contract herein provided for is adopted by said districts." Accordingly, under RSA 194:21-c, the portion of RSA 194:21 requiring only a majority of voters present and voting to approve a joint maintenance agreement does not apply to long-term contracts under RSA 194:21-b.

Alternatively, the petitioners argue that the twenty-year agreement is a contract made under RSA 194:22 (1999). RSA 194:22 provides:

> Any school district may make a contract with a[] . . . high school . . . located in this . . . state, and raise and appropriate money to carry the contract into effect. If the contract is approved by the state board the school with which it is made shall be deemed a high school maintained by the district.

The petitioners assert that, under RSA 194:22, *no* voter approval was required to raise and appropriate money to fund the twenty-year agreement. They assert that to make the agreement effective, it was necessary *only* for the State Board of Education to approve it. This construction contravenes the plain language of the statute, which permits the school district, not the board of education, to raise and appropriate money to carry an agreement under RSA 194:22 into effect. *Cf. Kondrat v. Freedom School Board*, 138 N.H. 683, 685 (1994) (interpreting another statute under RSA chapter 194, court states that term "school district" refers to voters within that district).

■ Indeed, RSA 194:22 is silent as to the procedure the school district must follow to raise and appropriate money to carry the contract into effect. Pursuant to RSA 197:3, if a school district votes at a special meeting to "raise and appropriate money" to carry a contract under RSA 194:22 into effect, then the requirements of RSA 197:3 apply.

Finally, the petitioners assert that the trial court erroneously denied their motion for reconsideration and for a hearing on the merits. As they concede that their motion was untimely, we sustain the trial court's denial of it. *See Town of Hudson v. Baker*, 133 N.H. 750, 753 (1990); *see also*

SUPER. CT. R. 59-A. We decline the petitioners' invitation to address the trial court's dicta regarding the doctrine of res judicata.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.