Hillsborough-northern judicial district
No. 2005-093

WILLIAM FOOTE & a.

v.

MANCHESTER SCHOOL DISTRICT & a.

Argued: July 13, 2005
Opinion Issued: September 7, 2005

*The Law Office of Mark A. Stull,* of Manchester (*Mark A. Stull* on the brief and orally), for the petitioners.

*Wadleigh, Starr & Peters, P.L.L.C.,* of Manchester (*Dean B. Eggert* on the brief and orally), for respondent Manchester School District.

*Wadleigh, Starr & Peters, P.L.L.C.,* of Manchester (*Eugene M. Van Loan, III* on the brief and orally), for respondent Bedford School District.

GALWAY, J. The petitioners, Bedford taxpayers William Foote and Raymond C. Dugdale, appeal the order of the Superior Court (*Conboy*, J.) denying their summary judgment motion and granting the cross-motions for summary judgment filed by the respondents, the Manchester School District (MSD) and the Bedford School District (BSD). We affirm.

The trial court accepted the following facts as undisputed, many of which were derived from our opinion in a related appeal. *See Bedford Chapter—Citizens for a Sound Economy v. Sch. Admin. Unit #25*, 151 N.H. 612 (2004). Historically, BSD has not had its own high school. *Id.* For more than seventy years, it has sent its students to Manchester high schools. *Id.* at 612-13. The school districts of Auburn, Candia and Hooksett have also traditionally sent their students to Manchester high schools. *Id.* at 613.

In the spring of 2001, MSD gave BSD and the other school districts two-year notice that the existing twenty-year tuition contract between MSD and these school districts would terminate at the conclusion of the 2002-2003 school year. This meant that, absent a new agreement, BSD could no longer send its students to Manchester high schools.

MSD and the school boards of BSD and the other school districts began negotiating the terms of a new twenty-year tuition agreement. *Id.* These negotiations were completed in 2002. In spring of 2003, the school boards submitted a proposed new twenty-year agreement to their respective school districts at their annual meetings. *Id.* Although Auburn, Candia, Hooksett and Manchester voters approved the agreement, BSD voters did not. *Id.* Because BSD voters rejected the proposed twenty-year contract, BSD had no contract or any other arrangement for the education of its high school students at the end of the 2002-2003 school year.

MSD and the school board of BSD then began negotiating a three-year agreement. *Id.* The school board and MSD entered into such an agreement in July 2003. *Id.* Under this agreement, BSD agreed to enroll and MSD agreed to accept all BSD public high school students for the 2003-2004, 2004-2005, and 2005-2006 school years, in exchange for a per pupil tuition payment. *Id.* The per pupil tuition payment had an operating expense component and a capital expense component. *Id.* The agreement provided that if BSD voters ratified the proposed twenty-year tuition agreement by June 1, 2004, the twenty-year agreement would supersede the three-year agreement. *Id.*

The BSD school board executed the three-year agreement on July 1, 2003. The State Board of Education approved it on July 16, 2003.

At the BSD's March 2004 annual meeting, BSD voters approved a warrant article to raise a $1.8 million deficit appropriation for the 2003-2004 school year to fund the capital component of the first year's tuition

under the three-year agreement. *See id.* BSD voters also approved a general budget that included the entire tuition payment for the 2004-2005 school year. This tuition payment included a $4.4 million appropriation to fund the capital component. *See id.*

In June 2004, the petitioners brought the instant action against BSD and MSD challenging the validity of the three-year agreement and the validity of the March 2004 votes. In addition to seeking a declaration that the three-year agreement was void, the petitioners sought an injunction to bar BSD from paying the capital component of the tuition payment in the future and an order requiring MSD to return to BSD capital expenses already paid, with interest.

The petitioners moved and the respondents cross-moved for summary judgment. The trial court denied the petitioners' motion and granted the respondents' cross-motions. *See id.*

On appeal, the petitioners argue that the school board was required to receive voter approval before it could enter into the three-year agreement. Absent prior voter approval, they contend that the agreement was invalid, which, they assert, entitles them to an injunction barring payment of the capital component of the tuition payment in the future and entitles BSD to restitution of the capital expenses already paid. They concede that even if the agreement is void, payment of per pupil operating costs was lawful. *See* RSA 194:27 (1999).

The petitioners rely upon RSA 194:22 (1999), RSA 194:21-a, :21-b (1999) and RSA 32:6, :8 (2000) to support their arguments. We address each statute in turn.

We review the trial court's statutory interpretation *de novo.* *Blackthorne Group v. Pines of Newmarket*, 150 N.H. 804, 806 (2004). We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. *Bedford Chapter*, 151 N.H. at 614. We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When the language of a statute is plain and unambiguous, we need not look beyond it for further indication of legislative intent. *Id.* We refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *Blackthorne Group*, 150 N.H. at 806. Moreover, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.* By so doing, we are better able to discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. *Id.*

*A. RSA 194:22*

The petitioners first argue that RSA 194:22 required the BSD school board to obtain prior approval from BSD voters before entering into the three-year agreement. We disagree.

RSA 194:22 provides:

> Any school district may make a contract with a[ ] . . . high school . . . located in this . . . state, and raise and appropriate money to carry the contract into effect. If the contract is approved by the state board the school with which it is made shall be deemed a high school maintained by the district.

As we recognized in *Bedford Chapter*, 151 N.H. at 617, "RSA 194:22 is silent as to the procedure the school district must follow to raise and appropriate money to carry the contract into effect." RSA 194:22 likewise is silent as to the procedure the school district must follow to make the contract in the first place. Nothing in RSA 194:22 requires voter approval before the contract may be made.

The petitioners argue that RSA 194:22 requires prior voter approval because they interpret the term "school district" to mean the voters within that district. In support of this assertion, they mistakenly rely upon *Kondrat v. Freedom School Board*, 138 N.H. 683, 685 (1994).

*Kondrat* concerned the interpretation of RSA 194:10 (1999), which provides:

> At its annual meeting each school district shall determine the salaries of its school board and other district officers, and the district clerk shall certify the same to the selectmen.

We held that the "plain language of the statute designates the 'school district,' *i.e.*, the voters, as the body responsible for determining the salary of the auditor, and the annual meeting as the proper time for making such determination." *Kondrat*, 138 N.H. at 685.

The petitioners argue that because in *Kondrat* we held that the term "school district" in RSA 194:10 referred to the district's voters, the term must have the same meaning in RSA 194:22. In RSA 194:10, however, the term "school district" is modified by the phrase "[a]t its annual meeting." In context, therefore, the term "school district" as used in RSA 194:10 refers to district voters who meet annually "for raising and appropriating money for the support of schools . . ., for the transaction of other district business and . . . for the choice of district officers." RSA 197:1 (1999).

The petitioners also contend that in *Bedford Chapter*, we held that the term "school district" in RSA chapter 194 (1999 & Supp. 2004) means the

voters of the district and not the school board. The petitioners misconstrue our holding in that case.

At issue in *Bedford Chapter* was whether a warrant article presented at a special meeting of the BSD involved a vote to raise and appropriate money. If the warrant article involved such a vote, then the article could not pass unless the votes cast at the special meeting equaled at least one-half of the number of BSD voters entitled to vote at the BSD 2004 annual meeting. *Bedford Chapter*, 151 N.H. at 614; *see* RSA 197:3 (1999). If the warrant article did not involve such a vote, then it could pass by a simple majority of voters present. *Bedford Chapter*, 151 N.H. at 614.

The warrant article at issue asked BSD voters to authorize the BSD school board to enter into a new twenty-year tuition agreement with MSD. *Id.* We held that asking for prior voter authorization to enter into the tuition agreement was akin to asking for an appropriation and, thus, the warrant article involved a vote to raise and appropriate money. *See id.* at 615-16.

The only argument regarding RSA 194:22 that we directly addressed in *Bedford Chapter* was the appellants' assertion that the tuition agreement required approval only by the State Board of Education. *Id.* at 617. In rejecting this argument we construed the plain language of RSA 194:22 to permit the school district, not the State Board of Education, to raise and appropriate money to carry an agreement under RSA 194:22 into effect. *Id.*

The petitioners' arguments misapprehend the nature of school districts. RSA 194:2 (1999) provides that all legally organized school districts are "corporations, with power to sue and be sued, to hold and dispose of real and personal property for the use of the schools therein, and to make necessary contracts in relation thereto." Like other municipal corporations, each school district consists of a legislative and a governing body. RSA 21:47, :48 (2000). The legislative body is the school district meeting. RSA 21:47. The governing body is the school board. RSA 21:48.

Generally, the authority to make contracts on behalf of the school district rests with the school board, as the district's governing body. *See* 56 AM. JUR. 2D *Municipal Corporations, Etc.* § 449 (2000); *see also* RSA 21:29 (2000) (school board is "entrusted with the hiring of teachers and the management of the prudential affairs of the district"). The school board is thus "the managing board of the school district." *Ashley v. School Dist.*, 111 N.H. 54, 55 (1971). The authority to raise and appropriate money, on the other hand, rests with the school district meeting as the district's legislative body. *See* RSA 197:1, :3 (1999).

■ With this understanding of the term "school district," it becomes clear that, as used in RSA 194:22, the term refers both to the district's school board and to its voters at a district meeting. The school board "may make a contract with a[ ] . . . high school . . . located in this state," and the district voters at a district meeting may "raise and appropriate money to carry the contract into effect." RSA 194:22. This interpretation comports with our holdings in both *Kondrat* and *Bedford Chapter*.

### B. RSA 194:21-a, -b

The petitioners next assert that prior voter approval was required by RSA 194:21-a and RSA 194:21-b. RSA 194:21-a and RSA 194:21-b follow RSA 194:21 (Supp. 2004), which pertains to "Joint Maintenance Agreements." Joint maintenance agreements are contracts between "[t]wo or more adjoining districts . . . for establishing and maintaining jointly a high school or other public school" for the benefit of district pupils. RSA 194:21, I. RSA 194:21-a provides that the term of such an agreement may not exceed "20 years from the date of the contract." RSA 194:21-b provides that contracts under RSA 194:21-a may be adopted by the school district at its regular annual meeting or at a special meeting called for that purpose.

The petitioners' reliance upon RSA 194:21-a and RSA 194:21-b is misplaced. These statutes, by their express terms, apply only to joint maintenance agreements. RSA 194:21-a provides, in pertinent part, that school districts may "contract with each other for the establishing and maintaining jointly a high school for the benefit of their pupils." RSA 194:21-b pertains only to contracts "provided for by RSA 194:21-a." As the petitioners concede, the three-year agreement "clearly is not" a joint maintenance agreement. It is not an agreement between BSD and MSD to establish and maintain jointly a high school, but is rather an agreement by MSD to enroll BSD students in high schools that MSD has established and maintained. The agreement gives BSD no control over MSD high schools.

■ The petitioners argue that "a contract may be a long-term contract under [RSA] 194:21-a without also being a joint maintenance agreement." We disagree. The only long-term contracts to which RSA 194:21-a pertains are those "for the establishing and maintaining jointly a high school." RSA 194:21-a.

### C. RSA 32:6, :8

The petitioners next contend that prior voter approval was required by RSA 32:6 and RSA 32:8. RSA 32:6 requires that municipal appropriations be made only "by vote of the legislative body of the municipality at an

annual or special meeting." RSA 32:8 precludes a school board from paying or agreeing to pay "any money, or incur any liability involving the expenditure of money, for any purpose in excess of the amount appropriated by the legislative body for that purpose, or for any purpose for which no appropriation has been made, except as provided in RSA 32:9-11."

The petitioners assert that the three-year agreement itself was an "appropriation" within the meaning of RSA 32:6. They also contend that the three-year agreement was unlawful because it required expending more money to educate BSD high school students than BSD voters approved at the March 2003 meeting. Because we hold that the BSD voters ratified the BSD school board's actions, we need not decide whether the school board violated either RSA 32:6 or RSA 32:8, or whether, if it had, the three-year agreement would be void. *See* RSA 32:12 (2000).

"Ratification by a municipal corporation can be express or implied." *Appeal of Sanborn Regional School Bd.*, 133 N.H. 513, 520 (1990). Implied ratification "arises out of the principal's conduct," while express ratification occurs "only . . . where the municipality embraces the acts of its agent in a manner provided by law." *Id.* Whether express or implied, "ratification by the principal, in this case the school district voters, requires full knowledge of the financial terms of the [contract]." *Id.* A legislative body of a municipal corporation is bound by a multi-year contract "only if it knew about the cost items for *each* year of the [contract] at the time it voted to appropriate money for the contract's *first* year." *Appeal of Franklin Education Assoc.*, 136 N.H. 332, 334 (1992). "Although voters are often apprised of the financial consequences of their actions through language in warrant articles," warrant articles are not the only mechanism for sufficiently apprising voters "of subject matter upon which favorable action will bind the district to monetary obligations extending over a term of years." *Appeal of Town of Rye*, 140 N.H. 323, 327 (1995) (quotation omitted). "Therefore, we will review all evidence that tends to establish such knowledge to see if the cost item was properly ratified." *Id.*

Here, the undisputed evidence is that the BSD school board sent a letter to essentially every registered voter of record in Bedford before the March 2004 BSD meeting. This letter informed BSD voters about the financial impact of each year of the three-year agreement before they voted to approve the deficit appropriation necessary to fund the capital component of the first year's tuition payment. *See id.* Before the March 2004 meeting, BSD voters thus were informed that the three-year agreement "requires a capital payment of $10.6 million—$1.8 million to be paid this year and $4.4 million to be paid in each of the next two years." The voters were also informed that one of the warrant articles asked for approval of a "deficit

appropriation of $1.8 million, owed to the Manchester School District for the 2003-2004 school year" and that this money had not been part of the 2003-2004 budget "because the contract was not negotiated and signed until after [the previous] March's election."

BSD voters were informed about not only the fact and extent of the financial burden, but also its implications. *See id.* For instance, the letter told BSD voters that if they did not approve the deficit appropriation, the school district would have to "default on the contract or ... make very, very severe cuts" to its operating budget. They were further told that budget cuts would "require laying off staff and increasing class sizes in grades K-8" and would negatively affect education quality.

■ Because the evidence is that BSD voters knew of the financial consequences of each year of the three-year contract before they approved the deficit appropriation to fund the first year's tuition payment fully, we hold that they ratified the contract.

The petitioners contend that any such ratification was invalid because the wording of the warrant article asking for the deficit appropriation was misleading in that it told voters that BSD was "obligated" to pay MSD $1.8 million for its share of capital costs. The petitioners rely upon precedent developed in the election law context. They assert that because the warrant article's wording allegedly was misleading, the intent of BSD voters is "in doubt" and voids their adoption of the article. *Appeal of Soucy,* 139 N.H. 110, 117 (1994).

To invalidate the results of the March 2004 school district meeting, the petitioners must "prove either fraud which leaves the intent of the voters in doubt or irregularities in the conduct of the election of such a nature as to affect the result." *Id.* (quotation and brackets omitted). The petitioners have failed to meet this burden. *See Board of Selectmen v. School Bd.,* 113 N.H. 598, 603 (1973).

■ The petitioners have not alleged election fraud. *See Soucy,* 139 N.H. at 117-18, *see also Appeal of McDonough,* 149 N.H. 105, 114 (2003). At best, they allege "irregularities." *Soucy,* 139 N.H. at 117. We will not void votes at the school district meeting "because of mere irregularities or technicalities in the form of a ballot, election or vote." *Appeal of McDonough,* 149 N.H. at 112. The party challenging a warrant article, after its passage, bears the burden of establishing that in all likelihood, its defects affected the outcome of the vote. *Neville v. Highfields Farm,* 144 N.H. 419, 427 (1999).

■ It is our consistent practice to construe votes passed at town and school district meetings liberally. *Lamb v. Danville School Board,* 102

N.H. 569, 571 (1960). If such votes "fall within the authorized powers of the town [or school district], ingenious distinctions will not be unnecessarily resorted to when the effect would be to defeat the apparent intention of the voters in a matter admittedly within their legislative province." *Amey v. Pittsburg School District*, 95 N.H. 386, 388 (1949) (quotation and ellipsis omitted).

The disputed warrant article read as follows:

> **Article V. [Deficit appropriation to pay 2003/2004 capital costs to Manchester unanticipated at the March 2003 Annual School District Meeting.] (Special Warrant Article)** Shall the school district raise and appropriate the sum of One Million Eight Hundred Thousand Dollars ($1,800,000) as a deficit appropriation for the 2003/2004 fiscal year to fund the first year of the district's share of the capital costs which the district is obligated to pay to the City of Manchester over 3 years under its current high school tuition arrangement and for which no appropriation was made at the 2003 Annual School District Meeting? **(The school board recommends a "yes" vote on this question.) (Majority ballot vote required).**

When liberally construed in its entirety, we hold that this warrant article sufficiently described the situation "for voters to make a rational decision." *Neville*, 144 N.H. at 427. The evidence here does not "compel the conclusion that a different result would have been reached" had the warrant article been differently worded. *Leonard v. School District*, 98 N.H. 296, 298 (1953).

*Affirmed.*

BRODERICK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.